Opinion
DONDERO, J.
I. INTRODUCTION
Following years of strife between Jennell Renee Wright and her former boyfriend, Le’Mar Green, some of it centered around their three-year-old son, defendant drove to Green’s home, waited for him to return from work, and shot him three times. A jury convicted defendant of first degree murder with a special circumstance finding of lying in wait.
On appeal, defendant argues the trial court erroneously failed to instruct on self-defense, imperfect self-defense and provocation/heat of passion theories of voluntary manslaughter, and on provocation as a basis for the reduction of murder from first to second degree. She also argues the evidence was insufficient to support the lying-in-wait special-circumstance finding, the court erroneously excluded defense evidence, and a juror’s postings on Facebook constituted prejudicial misconduct. We affirm.
*1465 II. STATEMENT OF THE CASE
By first amended information filed July 28, 2011, the Contra Costa County District Attorney charged defendant, Jennell Renee Wright, with the special circumstance murder of Le’Mar Green while lying in wait (Penal Code,[1] §§ 187, 190.2, subd. (a)(15)), and shooting at an occupied motor vehicle (§ 246) on February 23, 2010. The information alleged that she committed each offense while personally and intentionally discharging a firearm to cause great bodily injury or death. (§ 12022.53, subds. (b), (c), & (d).)
Jury trial commenced November 7, 2011, and was submitted to the jury on December 8, 2011. The jury was instructed on self-defense (CALCRIM No. 505); right to self-defense: mutual combat or initial aggressor (CALCRIM No. 3471); right to self-defense: may not be contrived (CALCRIM No. 3472); voluntary manslaughter-heat of passion (CALCRIM No. 570); voluntary manslaughter-imperfect self-defense (CALCRIM No. 571); and provocation: effect on degree of murder (CALCRIM No. 522).
During 10 days of deliberation, the jury made several inquiries.[2] One juror was replaced by an alternate, argument to the jury was reopened, and an Allen *1466 charge was given.[3] On January 11, 2012, the jury found defendant guilty of shooting at an occupied motor vehicle, and further found she personally and intentionally used a firearm. (§§ 246, 12022.53, subds. (b) & (c).)
The jury reached no verdict on the murder charge and made no finding on the allegation she personally and intentionally discharged a firearm causing great bodily injury or death in the commission of the section 246 charge. The court declared a mistrial on that charge and allegation.
Jury trial before the same judge commenced January 22, 2013. The trial court solicited briefing on the preclusive effect of the section 246 conviction on self-defense and voluntary manslaughter issues. Subsequently, the court refused to instruct on self-defense, imperfect self-defense, provocation, and voluntary manslaughter.
On February 26, 2013, after one day of deliberation, the second jury returned a guilty verdict of first degree murder, found true the special circumstance that she killed while lying in wait, and the allegation she personally and intentionally discharged a firearm causing great bodily injury or death in connection with each substantive charge.
On July 26, 2013, the court sentenced defendant for murder and firearm use to life without the possibility of parole, plus 25 years to life. For shooting into an occupied vehicle and firearm use, the court sentenced defendant to the midterm of five years, plus 25 years to life. The latter sentence was stayed pursuant to section 654. Defendant timely appeals.
III. STATEMENT OF FACTS
A. The Crime Scene
Pelican Loop in the City of Pittsburg is a secluded community of about 100 town houses with five parking lots. On February 23, 2010, Barbara Gee returned to her home at Pelican Loop at about 1:00 a.m. to find the body of her next-door neighbor Natasha’s fiancé lying facedown on the ground next to the driver’s door of his car. Gee called the police. At 12:50 a.m., another resident of Pelican Loop had been awakened by the sound of gunshots. The first shot was followed by a pause, then by two more gunshots that sounded *1467 as if they came from the parking lot. Shortly thereafter she heard a car drive out of the parking lot, pass her house going pretty fast, and turn onto Railroad Avenue.
Pittsburg Police Officer Jerald Lombardi arrived at Pelican Loop a few minutes after 1:22 a.m. A man’s body was lying facedown on the ground in the parking lot between two cars. His right hand was partially clenched into a fist. There was broken glass on the ground around the body. The car’s driver’s door was open and the driver’s door window was shattered. There was broken glass on the floorboard and front seat, and a bullet fragment on the driver’s seat. There were no signs of life. The driver’s license in a wallet in the man’s right rear pants pocket identified him as Le’Mar Green.
Green’s feet were one to one and a half feet from the open doorjamb. Lombardi found a pack of cigarettes and a single burned-out cigarette butt on the ground near Green. Liquid on the ground under Green’s mouth smelled of beer. There was no blood inside the car.
The keys were in the ignition, which was in an “on” position, and Lombardi could hear an audible alarm sounding an alert that the car door was open while the keys were inside the car. The engine was not running. In the center console of the car was a cold beer can about three-quarters full. Green’s cell phone was found in the car.
Approximately 10 feet from the body, behind the car, was a fully loaded speed loader containing six live rounds. Seven more live rounds were on the ground. The bullets in the speed loader were Homady .38-caliber Special rounds, hollow tip, as were the bullets found on the ground. No empty shell casings were found, indicating a revolver was used. No weapons or additional bullet damage to the car were found.
1. The Police Investigation
The City of Pittsburg has surveillance cameras in all the major intersections that feed information to a monitoring room at the police department, where the information is recorded by computer hard drive 24 hours a day, seven days a week. A police officer on monitoring duty at the station located seemingly relevant video footage. Still photos from that footage of the vehicles leaving the scene at approximately 12:51 a.m. that morning were taken to the investigating officers at the scene.
Green’s fiancée, Natasha Griffith, was located and informed of Green’s death. Griffith told police that defendant was the mother of Green’s three-year-old son, that Green had been ordered to pay child support in November *1468 of 2009, that defendant had been asking Green for more money, and that she had been excessively phoning and texting Green. Griffith was transported to the Pittsburg Police Department, where she identified defendant from a picture the police showed her. They also showed her a picture of a car she did not recognize. She told police defendant drove a beat-up red or wine-colored automobile.
Green’s mother, Lucinda Jackson, was summoned to the Pittsburg police station, where other family members were also gathered. Ms. Jackson told police the only person her son had problems with was defendant. She also identified defendant’s mother’s car at an intersection near Green’s home in a picture the police showed her.
Police used DMV (Department of Motor Vehicles) records to verify defendant’s mother’s car was a 1997 Toyota Avalon and matched it to the car in the surveillance video. When police later checked defendant’s home in Vallejo, no one was home. Defendant’s car was there, but her mother’s Avalon was not. Police learned that defendant did not go to work on February 23.
Later, police inspectors learned defendant had been arrested for possessing a concealed loaded firearm at the Mar Ray Motel on Railroad Avenue. Defendant had checked into the motel on February 22, 2010, after 10:00 p.m. Defendant did not appear intoxicated to the motel owner at that time.
The next morning, defendant did not check out despite several warnings. When she had not checked out by 2:30 p.m., the motel owner called the police. The responding officer told defendant she needed to leave. Defendant was moving slowly, and said she was feeling dizzy. She gathered her two bags and purse, and said her mother was coming to give her a ride.
Defendant sat outside to wait. A little while later, the motel’s housekeeper reported to the motel owner that defendant had a gun. The motel owner again called the police and when the police responded shortly thereafter, he pointed out to them defendant’s green Toyota Avalon. The cleaning lady pointed out live cartridges under the mattress in defendant’s motel room. They were hollow tip .38-caliber Special Hornady.
Defendant consented to a search of her belongings. Inside one bag was a small silver Smith & Wesson .38-caliber revolver containing six live rounds. Inside another bag were more live .38-caliber rounds. Defendant was arrested for possession of a loaded concealed firearm.
There were rounds of ammunition on the driver’s seat of defendant’s car, which was registered to Robbie Wright. Inside one of defendant’s bags police *1469 found an Orchard Supply and Hardware sales receipt and inside her purse they found some handwritten notes, which read: “I got to get Lucinda’s son and Robbie’s daughter,” “[i]t started with you and will end with you,” and “[u]nknown what to do February 20.” Inside her wallet was a debit card with Green’s photo. One of her bags contained “quite a bit of ammunition,” including three Hornady expended brass casings consistent with .3 8-caliber Hornady hollow tip bullets, and two water bottles of green liquid.
Defendant’s mother, Robbie Wright, and sister, Joann Wright, arrived at the Mar Ray Motel after defendant had been taken to jail. They advised the police inspector they were afraid defendant might have attempted suicide at the motel. They were subsequently interviewed separately at the police station. The police did not tell them Green had been killed or that defendant was a suspect until after they were interviewed.
Joann Wright told the police that defendant and Green had been arguing on Saturday, February 20, when Green came to pick up their son. Joann said: “She was just real[ly] talking nasty to him and trying to provoke him to say stuff.” Joann remembered thinking she hoped Green did not say anything to defendant because if he did there would be an argument.
The recording of Robbie Wright’s interview was played for the jury. She lived in Vallejo with defendant and Joann. On Monday evening around 10:00 or 11:00 p.m., defendant asked Robbie if she wanted anything from the store, and Robbie said no. At 4:00 a.m. the next morning, Joann noticed Robbie’s car was gone, but defendant’s red Plymouth Breeze was parked in front of their house. Defendant’s mother was afraid defendant was going to attempt suicide again, as she had two years before, because she is mentally ill. Robbie repeatedly called defendant’s cell phone and finally got an answer. Defendant said she was ready to come home, but could barely talk. Robbie noticed defendant’s Prozac bottle was empty.
Robbie described defendant’s previous suicide attempt in 2008 and her subsequent hospitalization and treatment. She knew that defendant and her baby’s father did not get along. They argued. Robbie described them as “a fuse . . . [wjhen they get together.” She agreed with the interviewer’s characterization of their relationship as “pretty volatile at times.”
Robbie thought defendant was still in love with Green and wanted to get back with him. When Green moved on and started living with his new girlfriend, Natasha, it “threw her over the edge.” Defendant could not accept Green’s new girlfriend.
Robbie and Joann Wright allowed a search of their home. Inside defendant’s bedroom the inspectors found many empty tequila bottles in the dresser *1470 drawers and on the floor, and a bottle of green antifreeze. There were three empty ammunition boxes, two for Hornady hollow point bullets and one for .38-caliber lead bullets. They also found speed-loader packaging and a day care contract.
Robbie Wright agreed to a search of her car. Inside the car were three live .38-caliber Hornady hollow tip rounds, a half-full tequila bottle, and a partially full acetaminophen bottle.
After interviewing Robbie and Joann Wright, the inspectors tried to interview defendant in a holding cell at the jail. She was barely responsive, and very lethargic. She was seated on the floor, and could not stand up by herself. The inspector could tell something was wrong; she “appeared altered.” The inspector helped her stand up and asked her what she had taken. Eventually defendant revealed she had taken a whole bottle of Prozac and ingested antifreeze. The inspector requested emergency fire and ambulance aid and verified that the officer who had searched defendant’s belongings had located empty pill bottles and a water bottle containing a liquid consistent with antifreeze. Defendant was transported to the hospital in a very serious condition.
2. Surveillance Video Evidence
Surveillance video from the Mar Ray Motel from 10:00 p.m. to midnight showed a vehicle entered the motel on February 22, 2010, at about 10:34 p.m. and left the premises at about 11:54 p.m.
A compilation of surveillance video from City of Pittsburg cameras at various locations showed a 1997 Toyota Avalon leaving the Mar Ray Motel on February 22, 2010, at 11:53 p.m. The car turned onto Railroad Avenue, drove through the downtown area and to Pelican Loop. Later, Green’s Pontiac Grand Prix drove on Railroad Avenue through the downtown area and to Pelican Loop on February 23, 2010, at about 12:41 a.m. About 12:50 a.m., the Toyota Avalon drove from Pelican Loop with its lights off to Railroad Avenue, when its lights turned on, and drove on Railroad Avenue to the Mar Ray Motel.
Green worked from 3:30 p.m. to midnight. Normally, when Green got off work, he would buy a pack of cigarettes and a beer, then sit drinking the beer and smoking cigarettes in his Pontiac Grand Prix in the parking lot at Pelican Loop.
3. The Autopsy and Ballistics Findings
Green was six feet five inches tall and weighed 209 pounds. He died of multiple gunshot wounds. There were three bullets in his body. One bullet *1471 entered his left chest just above the nipple. It was fired from his left and travelled to his right and sharply downward at a 45-degree angle through the third rib, left lung, heart, diaphragm, and liver, before coming to rest in the right flank. The other two bullets entered the left arm and left shoulder within inches of each other. The bullet that entered the left arm was also fired from Green’s left, traveled left to right, and sharply downward as it went through the left arm, armpit, chest, left lung, heart, diaphragm, and liver before coming to rest in the right flank lower than the bullet that entered the chest. The bullet that entered the left shoulder was also fired from Green’s left, traveled from left to right and downward as it went through the left arm, armpit, and came to rest outside the chest wall without penetrating the chest or any organs. It was not a fatal wound. The right wrist had gunpowder stippling, which can occur within 18 inches of the gun barrel.
A firearms expert compared defendant’s Smith & Wesson revolver with the bullets recovered from Green’s body. The two autopsy bullets were fired from the revolver. The revolver did not have a hair trigger. The speed loader found in the parking lot was for a revolver that holds six unfired cartridges in its cylinder.
Defendant’s blood samples, taken on February 23, 2010, at 8:15 p.m., tested negative for alcohol, methamphetamine, and cocaine, but positive for opiates, specifically hydrocodone. The hydrocodone was present in the lowest detectable concentration — 0.02 milligrams per milliliter- — -and could have resulted from ingestion two days prior to the test.
4. Defendant’s Statement to Police at the Hospital
Police inspectors interviewed defendant at the hospital on February 25, 2010. The recorded interview was played for the jury.
Defendant admitted she accidentally shot Green. “I was just going to shoot at him.” She bought the gun and ammunition to shoot herself. “It was just too much stress.” While she was in the motel room she decided to scare Green. Defendant was angered by Green’s relationship with his new girlfriend and his failure to fulfill his responsibilities with defendant’s son. She waited in the parking lot for about 10 minutes before he got there. She sat and watched Green for about five minutes before going to shoot at him.
The first time she fired, she missed. The shot shattered the glass. Then he got out of his car and tried to hit her. He asked what she was doing there. When he tried to come after her she got scared. He came towards her between the two cars. She fired once or twice. She thought maybe she hit him in the leg. He fell; she ran.
*1472 When she got back to the motel room she took pills and drank antifreeze to kill herself. She said Green’s work schedule had changed and she did not know Green would arrive while she was at the lot. Green told her where he lived, but she had never been there before.
She had some feelings for him, but she was not in love with him. She was not upset he had a new girlfriend. She did not plan to scare Green. She decided to scare Green at the motel room.
B. Defendant’s Relationship with Green
Lucinda Jackson (Green’s mother), Robbie Wright (defendant’s mother), Joann Wright (defendant’s sister), Natasha Griffith (Green’s fiancée), and Andre Haywood (Green’s friend) testified about defendant’s stormy relationship with Green.
According to Jackson, after their son was born in 2007, Green and defendant tried to make a go of it, but they could not get along. Green moved back in with his mother in November of 2007 and lived with her until she moved away in July of 2008. Green moved back in with Jackson in February 2009, after she returned to Antioch. In March or April 2009, Jackson asked a friend from work, Natasha Griffith, to live with her. Griffith and Green became romantically involved and eventually moved to Pelican Loop.
From 2007 through 2008, Green’s relationship with defendant was stressful, tumultuous, and scary. Defendant would show up at Jackson’s house regularly. If Green did not answer his phone, defendant would call Jackson. She would knock on Jackson’s window and wake her up.
After Griffith moved in, there was an incident where defendant came to Jackson’s house at about 10:30 p.m., dressed in dark clothing. She was very aggressive and very angry and said Green was not answering his phone. Defendant wanted to know who lived in Jackson’s house and who Griffith was. After that, defendant would not let Green or Jackson see their son for four months.
According to Griffith, in the fall of 2009, Green “really wanted to get custody of his son.” He “took Ms. Wright to court. He served her.” Jackson helped Green with his court papers to get an order for visitation and custody. During that time period, Green showed Griffith threatening text messages to him from defendant. One said she would not stop until he was six feet under. Other texts said, “I’m going to end you” and “[y]ou’re going to have nothing.” Eventually, defendant and Green reached a visitation agreement that Green would pick up their son from defendant every other weekend on *1473 Saturdays at 11:00 a.m. and return him to defendant on Mondays at about 2:00 p.m. before Green went to work. The exchanges were always at defendant’s home in Vallejo and never at Griffith’s home on Pelican Loop.
Griffith confirmed that after she moved in with defendant and his mother, defendant came to Jackson’s house and tried to force her way inside. Defendant was upset, very mad, and aggressive.
After Griffith and Green moved to Pelican Loop in October 2009, Green was adamant about not letting defendant know where he lived. At that point, the relationship between defendant and Green was “very turbulent” and they were not on good terms. Their telephone conversations were “ugly.”
Griffith overheard several telephone conversations between defendant and Green. From November 2009, Green argued with defendant on the phone and received threatening text messages from her. Griffith believed the arguments were triggered because defendant wanted him back, and he continued to live with Griffith. “She didn’t like that at all.” But there was also an ongoing battle between defendant and Green over custody, child support, and the child’s care. One issue was “[t]hat he wanted his son.” He was concerned because his son was terrified of water, unkempt, unable to use a fork or spoon and “appealed] to be slightly autistic.” Green stressed that the child “needed to be checked out.”
In August or September 2009, Green asked his friend Andre Haywood to help him serve custody papers on defendant. After Haywood handed defendant the papers, defendant told Green, “You better enjoy your son while you can.”
Haywood described Green’s relationship with defendant as “real shaky.” Green did not want to be on the phone with defendant because they would argue. Often, Haywood could hear defendant screaming at Green on the phone. If Green did not answer his cell phone when she called, there would be 20 or 30 missed calls from her and text messages in which defendant threatened to call Green’s mother’s phone and wake her up, or text things like, “If you don’t pick up, I’m not going to stop until you’re six feet under.” In 2009, when Green lived in Concord, Haywood would come over and they would work on cars for extra money. Sometimes defendant would park down the street and call him from her car.
In November 2009, defendant, her two sons, her mother, her sister, and her sister’s teenage daughter moved into a six-bedroom house in Vallejo. By early 2010, that arrangement had soured. There were arguments about finances, defendant’s failure to pay her fair share of the household expenses, *1474 defendant’s oldest son’s troubles at school, and putting Green and defendant’s son in day care. The situation was aggravated by Robbie Wright’s surgery for carpal tunnel syndrome in January. Robbie was no longer able to take care of their son, and defendant had to pay for his day care.
In January 2010, they had a birthday party for their son that Green attended. Green and defendant were still fighting. Defendant wanted to talk to Green when he was leaving the party and would not let him go. Green asked Robbie Wright to help him so he could leave. Green told Robbie where he was living but asked her not to tell defendant.
When Robbie Wright saw the yellow tape at the motel, she thought defendant had killed herself due to too much pressure. The police did not tell her otherwise before she talked to them. In addition to attempting suicide on February 23, 2008, defendant also tried to kill herself at Mare Island the night after her birthday on December 26, 2009.
C. Defendant’s Prior Testimony
Defendant’s sworn testimony from the first trial was read to the jury by the prosecution. She first met Green in 2002. They were friends and coworkers and she started dating him in 2004. He moved in with her, her mother, and her oldest son. She became pregnant, and wanted the baby, but Green did not. She felt hurt and abandoned. They started not getting along, squabbling about various issues. She ended up not having that baby. She became stressed and depressed to the point she could not get up and complete normal tasks. She was drinking a fifth of tequila a day after work.
In 2006, defendant became pregnant again. Green did not want this child either. The couple broke up and Green went to live with his mother. That made her feel sad and hurt.
Their son was bom in January 2007. She still loved Green, but she did not see him very often after their son’s birth. After she gave birth, defendant started to feel more depressed. She had trouble concentrating, remembering things, getting out of bed. She was stressed about her job and financial problems. She saw a doctor at Kaiser and was prescribed Prozac, which she took without any success. She started drinking on a daily basis.
Right after she went back to work in April 2007, Green moved back in with her. He would watch their son during the day when she was at work. Their relationship was “off and on.” They argued about childcare and money, and she remained depressed about her work and home life. Eventually, Green moved out again.
*1475 In March of 2008 she tried to kill herself by taking sleeping pills with alcohol. She resumed the use of Prozac. She and Green continued to argue about money and childcare. She moved to Antioch to be closer to her childcare provider. However, Green was living nearby. While she saw him infrequently, they regularly fought over childcare payments.
She started dating her supervisor, Dwayne McFadden, in January or February 2009, and they were married in August 2009. At that time, defendant and Green were embroiled in a custody dispute that was ultimately resolved by an agreement giving both parents joint legal custody and Green visitation every other weekend.
In September 2009, defendant and Dwayne’s relationship became tumultuous, and they separated. She was drinking a fifth of tequila daily and using Vicodin, Oxycontin, and Prozac to relax and feel “normal.”
In November 2009, defendant moved into a house in Vallejo with family members to ease her costs. Her depression persisted and she continued self-medicating. Defendant soon stopped getting along with her mother and sister. She argued with her family about housework, money, spending time with her kids, her oldest son’s bad grades. At work, defendant sparred with her coworkers about work not getting done. She was drinking a quart of tequila daily and taking prescription drugs. These several stressors built up to the point she attempted suicide again in December 2009 by taking sleeping pills at the marina near Mare Island “because it was a place where nobody would find me.” She went to see a Kaiser therapist, who put her back on Prozac.
In December 2009, defendant and Green tried unsuccessfully to get together. In November 2009 she learned Green had begun dating a girl who lived with Green’s mother. Defendant believed she was being cheated on if Green was with her and Natasha Griffith at the same time.
In January 2010, defendant was still feeling morose and having suicidal thoughts. Green threatened custody modification with their son, claiming defendant was unfit. He was keeping their son’s clothes after visits. She did not know where Green lived, and she worried she would not know where to look for their son if Green did take him. Green refused to tell her where he currently lived. At some point she overheard Green telling his address to her sister and wrote it down so she could look it up. However, she never visited the location until the night of the shooting. Defendant denied she sent Green a text message during this time, saying, “I won’t stop until you’re six feet under.”
In February 2010, defendant still loved Green, but she did not want him back and was not jealous of Griffith. She might have told a psychiatrist she *1476 thought she and Green were going to have sex at their son’s birthday party in January 2010, but denied saying she took off her clothes and tried to seduce him. She denied telling Anita Greenwood if she could not have Green, nobody was going to have him.
By this time, defendant stopped seeing her psychiatrist because she could not afford the co-payment. She resolved to kill herself on February 20 because both children would be out of the house that day. However, defendant did not kill herself on that date because her older son stayed home from school. When Green came to pick up their son that day, they did not argue.
Around this time, she wrote notes to herself, because sometimes it helped her feel better about what was going on. The notes were not all written at the same time. One note read in part: “It started with you. Will end with you. Never thought your pain was funny.” Defendant explained it referred to an argument they had at the time that made her feel as if he was laughing at her. She often felt Green was mocking her “[b]ecause he wouldn’t take me seriously when I tried to tell him things or I’d talk to him about things. [¶] . . . [¶] Sometimes he’d laugh. A lot of times he would do just the opposite of what I asked or what I needed done.” Another note read: “What was in the beginning will be in the end.” Other notes read: “I got to get Lucinda’s son and Robbie’s daughter,” and “[u]nknown what to do, February 20th, the end.” Lucinda’s son was Green, and Robbie’s daughter was defendant. February 20 was the day she was going to kill herself. Defendant was otherwise unable to explain what these notes meant. Defendant also wrote, “It started with you and will end with you,” “706 blue,” “five shots,” and “hollow.” She did not know what those meant.
She was going to take pills and then shoot herself with a gun she bought for protection at the end of January from a person in the neighborhood. She bought “a lot” of hollow tip bullets because they were on sale and the salesman said they were good bullets. She bought a speed loader for the gun because the “[s]ales guy said it would help me load the gun since I didn’t know anything about it.”
Defendant’s custody agreement with Green was that he would bring their son back on Monday, but they had a verbal agreement he would bring him back on that Sunday because defendant had already paid for childcare for the upcoming week starting Monday. Defendant worked Monday through Friday, 6:30 a.m. to 2:00 p.m. When Green did not bring their son back on Sunday, February 21, defendant worried Green was not going to bring him back in time to go to childcare on Monday. Defendant did not try to contact Green on Sunday or Monday morning to tell him what time day care was supposed to start.
*1477 Defendant was unable to work on Monday, February 22, because she had consumed too much alcohol on Sunday. She was stressed and depressed. While she was running errands that day, Green returned their son to defendant’s home. When defendant returned she saw the child in diapers without the clothes he wore when Green picked him up. This triggered defendant’s fear Green was hoarding his son’s clothes to facilitate his keeping the boy from her.
That night, defendant left her house about 10:00 p.m. because she was stressed and needed to go for a drive. She drove around on the freeway and ended up in Pittsburg, knowing Green lived there. She wanted to talk to him about his threats to take their son away from her. She got off the freeway at the Railroad Avenue exit, which was the closest one to Green’s home. She stayed at the Mar Ray Motel, which was near both the freeway and Green’s home. She was going to kill herself at the motel. She had decided to shoot herself with the gun she had obtained earlier and drink the antifreeze she had originally bought for her car. She had the loaded gun in her purse and had packed her mother’s travel bag with numerous bullets. She also had the speed loader fully armed and brought it with her, although she could not explain why. She had also packed her work clothes and makeup bag, in case she changed her mind.
At the Mar Ray Motel she initiated the process of suicide by drinking tequila, taking a couple of sips of antifreeze and downing Vicodin. She was not thinking about Green. She then fell asleep and woke up believing she needed to speak with Green about his threats to take her son away. She still was not thinking about hurting him. Yet she also testified she first got the idea to shoot him when she was in the motel room.
After leaving the motel, the next thing she recalled was parking the car in the front parking lot for the Pelican Loop apartments. She did not know exactly where Green lived. She parked in the front so she would not miss him if he were going by. Defendant used her mother’s car because it ran better, not because Green was personally familiar with her Plymouth Breeze. While parked, she continued drinking tequila, but felt nauseous until she fell asleep again. Defendant was unsure if Green still was engaging in his habit of having a beer and some smokes before exiting his car after work. She knew this was his usual practice. His prior schedule found him off work around midnight but she was unsure of his current shift. She denied timing her trip to Green’s home so she could be there when Green got home from work.
When she woke up, she saw Green sitting in his car. Defendant decided she wanted to talk to him. The next thing she remembered was standing by the driver’s side window of his car. She had the gun in her hand because she *1478 “wanted him to know I was serious when I came to talk to him.” “A lot of times he didn’t listen and he would laugh at me when I would tell him stuff.” She fired into the window “to get his attention.” She was not planning to shoot him or trying to kill him.
By this time, she was feeling the effects of what she had taken, sensing a lack of control. Green “jumped out the car” and “tried to grab” her. He was leaning forward. When he got out of the car, she backed up. He was angry and called her a “motherfucker.” He “swung at” her with a balled fist, almost touching her. She was not sure what he was going to do; she was afraid. Thinking he would hit her, she shot. She believed she shot him twice. She shot him from a distance of less than five feet. She was not angry as she was shooting. After the last shot, Green fell. Then she ran to her car and drove off. She did not call 911 or try to get help for him.
When she got back to the motel, she drank the rest of the antifreeze and took the rest of the pills to commit suicide. In the parking lot, defendant never thought about shooting Green, then killing herself.
At the hospital, she told police Green came after her exiting the car. She told them he tried to grab her and she shot him. When she was in the parking lot, she was not thinking that she would shoot Green and then kill herself. She never told Dr. Berg it was her original plan to scare or shoot at Green, then come back to kill herself. When she spoke to Inspector Conaty and Dr. Berg, she did not get a chance to explain to them everything that happened, but she told everyone she spoke to that she did not plan to shoot Green.
She did not remember telling Dr. Ferranti repeatedly that she was angry; she may have been upset. She denied telling Dr. Ferranti that she got really angry as she got ready to shoot Green. She did not recall telling Dr. Berg she shot at Green because she was angry at him for talking crazy to her. She denied telling Dr. Berg she shot at Green because she wanted him to spend time with their son, and did not recall telling Dr. Berg she thought that if she shot near Green he would do the right thing.
Defendant denied sitting outside Green’s apartment and waiting for him to come home when he lived in Concord, denied calling him at work all the time, denied putting sugar in his gas tank, egging Griffith’s car, sending Green threatening texts, or trying to get at Griffith when she was at Green’s mother’s house.
*1479 D. Defense Evidence
In the second trial, defendant testified again, in many ways consistently with the summary above of her testimony from the first trial. The details were similar. It is not necessary to repeat them in our discussion of the defense evidence.
Defendant did indicate Green infrequently provided her with money to help raise their son, giving her funds to purchase diapers or $100 every now and then. Only after November 2009, when the couple were involved in judicial custody proceedings, did the assistance from Green increase a bit.
Defendant also acknowledged she testified at her first trial the idea of shooting Green arose while she was at the motel before going to his home, but that was not true. “I may have misspoké, but that’s not what I meant.” She also recalled testifying she “never thought about it.” That was true. At the motel, she was thinking about killing herself, and feeling she needed to talk first with Green. She was unable to explain why she felt that way. A video recording of defendant at the jail was also played for the jury.
Dr. Melanie Lee, a physician, treated defendant in March 2008 and February 2010 for suicide attempts. On March 6 and 7, 2008, defendant was hospitalized for an overdose of Unisom, an over-the-counter sleeping medication which contains Benadryl, and alcohol. After being discharged from the ICU, defendant was sent to an inpatient psychiatric facility and referred to a psychiatrist, Dr. Towery. Defendant’s diagnosis was major depression.
Dr. Lee also saw defendant on February 24 or 25, 2010, when defendant was treated in the emergency room after taking antifreeze. Lab results showed defendant had profound metabolic acidosis and an elevated anion gap, which is consistent with ethylene glycol poisoning from ingesting antifreeze.
Dr. Towery was asked to do a psychiatric evaluation of and make a treatment recommendation for defendant. He saw her on March 7, 2008. Defendant came in following an overdose and the recommended treatment was that she be transferred for inpatient psychiatric treatment after she was medically stabilized. Based on his consultation with defendant, Dr. Towery diagnosed her with major depression, single episode and recurrent. Persons suffering from major depression may have suicidal thoughts, low or no enjoyment in doing things, low energy, low motivation for doing things, low interest in things, sleep and appetite disturbance, and often a lower sense of self-esteem. Major depression may also affect cognitive function. Treatment is usually a combination of psychiatric medication and psychotherapy and *1480 generally takes place in a psychiatric hospital or other supervised setting to prevent suicide. Prozac is commonly used to treat major depression. He did not follow up with defendant after the initial consultation. He next saw defendant on February 25, 2010, when he diagnosed major depression, recurrent, and alcohol abuse/dependence. He recommended she resume taking antidepressant medication.
On December 28, 2009, at about 2:00 a.m., Officer Ritzie Tolentino found defendant in a car parked in the middle of the road on the abandoned military base on Mare Island where there were no street lights and no people. Defendant was passed out inside the vehicle with the engine and lights on. She appeared to have passed out from intoxication. After being awakened, she was unable to talk. She was booked and taken to jail.
Dr. Leland Mew, a retired emergency room doctor, treated defendant on February 23, 2010, in the hospital emergency room when she was brought in by police and paramedics. She was lethargic and unable to answer questions. Knowing beforehand she had probably overdosed on ethylene glycol, which is toxic as well as lethal, he began immediate treatment for acidosis with stomach pumping and the antidote panipisol. Tests confirmed she had metabolic acidosis, which could be caused by ingesting antifreeze.
If a female five feet four inches tall and weighing 135 pounds drank a fifth of a liter of tequila from 11:00 p.m. to 1:00 a.m., by 8:15 p.m. that evening her blood-alcohol level would be at or near zero. A concentration of .02 micrograms per milliliter of hydrocodone would be at the lower end of the therapeutic range for a chronic user. Hydrocodone is an opiate contained in Vicodin. It can affect a person’s cognitive abilities. Alcohol can magnify the effects of opiates.
IV. DISCUSSION
Defendant contends the trial court erred prejudicially by failing to give requested instructions on the principles of homicide law that may reduce a first degree murder to a second degree murder or manslaughter. Specifically, the defense requested CALCRIM Nos. 505 (justifiable homicide and self-defense), 570 (voluntary manslaughter — provocation and heat of passion), 571 (voluntary manslaughter — imperfect self-defense), and 522 (provocation may reduce first degree murder to second degree murder). These instructions were given at the first trial.
The court’s rationale for refusing to instruct on these principles and lesser included offenses appears to have been twofold. First, the court may have concluded the first jury’s guilty verdict on count two, shooting into an *1481 occupied vehicle, precluded instruction on the issues of provocation, heat of passion, self-defense and imperfect self-defense in the second trial. Second, the court concluded defendant’s testimony at both trials, viewed in light of certain ancillary principles of homicide law, established as a matter of law that self-defense, provocation, heat of passion, and imperfect self-defense were unavailable as theories of defense. As we explain, the court made several errors, but we conclude the errors do not warrant reversal.
A.-E.*
F. The Trial Court’s Failure to Instruct on Provocation and Heat of Passion Manslaughter Was Error.
(1) Since 1872, statutory voluntary manslaughter has been defined as an unlawful killing “upon a sudden quarrel or heat of passion” (§ 192, subd. (a), italics added) and the malice required for murder has been implied “when no considerable provocation appears” (§ 188). As a result, both subjectively felt heat of passion and objectively reasonable provocation are needed to negate malice and reduce a murder to manslaughter (People v. Gutierrez (2002) 28 Cal.4th 1083, 1143 [124 Cal.Rptr.2d 373, 52 P.3d 572]), whether the heat of passion is generated by a sudden quarrel or a series of provocative acts over a long period of time. Thus, to warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that, at the time of the killing, defendant’s reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim’s conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection. (People v. Barton (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]; People v. Lasko (2000) 23 Cal.4th 101, 108 [96 Cal.Rptr.2d 441, 999 P.2d 666]; People v. Beltran (2013) 56 Cal.4th 935, 951 [157 Cal.Rptr.3d 503, 301 P.3d 1120].) The passion aroused can be anger, rage, or any violent, intense, highly wrought or enthusiastic emotion, except revenge. (People v. Breverman (1998) 19 Cal.4th 142, 163 [77 Cal.Rptr.2d 870, 960 P2d 1094].) “The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time.” (People v. Le (2007) 158 Cal.App.4th 516, 528 [69 Cal.Rptr.3d 831].)
As People v. Beltran, supra, 56 Cal.4th 935, has recently clarified, in California the law of provocation focuses on “ ‘emotion reasonableness’ ” *1482 (i.e., “whether ‘the defendant’s emotional outrage or passion was reasonable’ ”), not on “ ‘act reasonableness’ ” (i.e., “whether ‘a reasonable person in the defendant’s shoes would have responded or acted as violently as the defendant did.’ ”) (Gruber, A Provocative Defense (2015) 103 Cal. L.Rev. 273, 275 & fns. 9, 10, quoting Lee, Murder and the Reasonable Man: Passion and Fear in the Criminal Courtroom (NYU Press 2003) pp. 262-263 and citing People v. Beltran, at p. 945 [301 P.3d at p. 1136]; see Gruber, at p. 276, fn. 11.) We assess the emotional profile of the defendant and its connection to the reasonableness of her reaction to the provocation rather than whether it was reasonable for her to kill under the circumstances. As the Beltran court explained, the California test for sufficient provocation, properly understood, has never been whether the victim’s provocation would cause an ordinary person of average disposition to kill. (People v. Beltran, at p. 942.) “Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant’s state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. . . . [T]he anger or other passion must be so strong that the defendant’s reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured.” (Id. at p. 949.) “[Provocation is sufficient [when] ... it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without due deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate . . . .” (Id. at p. 950, italics added.)
Relying on earlier antecedents, the Beltran court stressed that whether adequate provocation and heat of passion have been shown are fundamentally jury questions, because jurors, by virtue of their random selection and varied backgrounds and occupations, are “ ‘much better qualified to judge of the sufficiency and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature, than the judge whose habits and course of life give him much less experience of the workings of passion in the actual conflicts of life.’ ” (People v. Beltran, supra, 56 Cal.4th at p. 948, quoting Maher v. People (1862) 10 Mich. 212, 222.)
Apparently focused exclusively on the second and third shots during the confrontation in the parking lot, the trial court refused to instruct on provocation and/or heat of passion, either as a means of reducing murder to manslaughter, or reducing first degree murder to second degree murder. The *1483 trial court reasoned such instructions were inapplicable because Green’s actions after being shot at in his car were the predictable conduct of a victim resisting the defendant’s conduct. (People v. Rich (1988) 45 Cal.3d 1036 [248 Cal.Rptr. 510, 755 P.2d 960].)[7] In the court’s view, such instructions were also inapplicable because words and simple assault are not legally sufficient provocation (People v. Gutierrez, supra, 45 Cal.4th 789 [89 Cal.Rptr.3d 225, 200 P.3d 847]) and because the provocation must come from the victim, not from the defendant’s personal circumstances (People v. Steele (2002) 27 Cal.4th 1230 [120 Cal.Rptr.2d 432, 47 P.3d 225]).
Defendant argues the trial court’s focus on the shooting alone was too narrow, and that abundant evidence adduced at trial about the acrimonious relationship between defendant and Green, particularly concerning their ongoing custody battle over their son, provided a substantial evidentiary basis for voluntary manslaughter instructions premised on a provocation heat of passion theory. We agree.
In light of the concurrence, it is worth reiterating we review the evidentiary support for an instruction “in the light most favorable to the defendant” (People v. Millbrook (2014) 222 Cal.App.4th 1122, 1137 [166 Cal.Rptr.3d 217]) and should resolve doubts as to the sufficiency of the evidence to warrant instructions “ ‘in favor of the accused.’ ” (People v. Flannel (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr.3d 84, 603 P.2d 1].) Here, the evidence adduced at the first trial was deemed sufficient to warrant provocation/heat of passion instructions. As a result, one of the defense theories for a manslaughter verdict advanced at the first trial was that Green’s repeated threats to take custody of their son away from defendant, which came to a head the weekend when Green returned him in a diaper and without his regular clothing, provoked in her emotions of intense fear, anxiety, hopelessness, depression and anger that obscured her reason.[8] Defense counsel argued the jury’s *1484 proper focus was on defendant’s state of mind; when she drove to Pelican Loop and shot Green she was consumed with thoughts about Green’s threats to take custody of her son away from her.[9] The trial court was thus on notice that defendant’s provocation/heat of passion theory hinged not on a “sudden quarrel” in the parking lot but on a provocatory course of conduct on Green’s part relating to their child.
At the second trial, considerable evidence was once again adduced to support this theory. Persons other than defendant testified about the contentious relationship between defendant and Green, much of which revolved around their son’s care and custody. The evidence showed that sometime after Griffith moved in with Jackson and Green in the spring of 2009, defendant would not let Jackson or Green see her son for several months. In response, Green filed for custody of their son, with Jackson’s help. According to Griffith, too, Green really wanted to get custody of his son and he took defendant to court to get custody. The court battle ended in November or December 2009 with defendant sharing legal custody with Green and keeping physical custody, with visitation for Green. Nevertheless, defendant testified that in January 2010 Green again started threatening to take custody of her son away from her and she feared he would actually do it one day. Griffith corroborated that defendant’s fear was not unwarranted: she testified that since November 2009, Green had been arguing with defendant. Griffith *1485 believed the arguments were partly about the ongoing battle between defendant and Green over custody, child support, and their son’s care. One issue was “[t]hat he wanted his son.” Green accused defendant of not potty training their son. He was concerned because in addition to not being potty trained, the child was terrified of water, unkempt, unable to use a fork or spoon and “appealed] to be slightly autistic.” Green stressed to Griffith that the child “needed to be checked out.”
At the first trial, defendant testified it upset her that Green thought she was an unfit mother. Green, along with her mother and sister, made her feel like a bad mother, and that added to her stress. On Saturday, February 20, when Green came to pick up their son, defendant and Green argued, according to defendant’s sister. According to defendant’s mother, when Green brought the boy back in a diaper after the visit, defendant was upset. Defendant testified at the second trial she was concerned when she saw her son in a diaper instead of a “pull-up,” because she feared he would regress in his potty training. She was also concerned because the child was not wearing the clothes she had packed for him; she was afraid Green was keeping the boy’s clothes at his house “[s]o that when he kept him, he’d have clothes for him.”
Defendant testified at both trials that on February 22, she was only going to talk to Green about his threats to take her son away from her. At the second trial, she testified Green threatened this “[a]ll the time,” sometimes daily, or when he came to get the child every other week. His threats added to the stress she was already feeling.
At both trials, defendant testified she took the gun when she went to talk to him because she wanted him to know she was serious about “him not taking [my son] from me.” “A lot of times he didn’t listen and he would laugh at me when I would tell him stuff.” At the second trial she said, “I didn’t think he would listen to me any other way.” At the first trial, she said she fired into the window of his car “to get his attention.” At the second trial she said she did not know why she shot into the car; she “wasn’t thinking,” not even about Green wanting to take her son away.
At the hospital after her arrest, defendant told police inspectors she was angry about his relationship with his new girlfriend and his failure to fulfill his responsibilities with his son. She said “[i]t was just too much stress.”
At the first trial, the prosecutor’s cross-examination of defendant suggested defendant told two doctors she was angry before she shot Green. She admitted only that she may have been upset. She also testified she was not angry as she fired two shots at Green. She felt she was not in control of *1486 herself. At both trials, defendant testified she did not remember driving from the motel to the victim’s home on Pelican Loop or walking from her car to his.
In our view, the evidence adduced at trial was sufficient to raise a factual question whether defendant was acting under the heat of passion provoked by Green’s repeated threats to take custody of her son away from her when she shot him. Cases dealing with provocation have considered behavior patterns that developed over a “provocatory” period as opposed to sudden and heightened instigative situations. One exemplar of the provocative period precedent is People v. Borchers (1958) 50 Cal.2d 321 [325 P.2d 97] (Borchers), where the 45-year-old defendant realized his girlfriend, Dotty, age 29, was cheating on him during their May to October relationship. “From the evidence viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of ‘passion’ by a series of events over a considerable period of time: Dotty’s admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, [her son] and himself on the night of the homicide, and her taunt, ‘are you chicken.’ ” (Id. at pp. 328-329, italics added.) “[T]he evidence . . . supports a finding that defendant killed in wild desperation induced by Dotty’s long continued provocatory conduct.” (Id. at p. 329, italics added.)
Similarly, in People v. Bridgehouse (1956) 47 Cal.2d 406 [303 P.2d 1018] (Bridgehouse), the defendant filed for divorce after learning of his wife’s long-standing infidelity, and obtained a restraining order prohibiting her from seeing her lover in the presence of their minor child. After the restraining order was served, “Mrs. Bridgehouse told him that she would fight his divorce action and would not hesitate to lie or use any other methods in so doing; that she would kill him if he tried to take the children away from her.” (Id. at p. 408.) However, she was not sure she wanted to leave her lover. The next day, the defendant took their small son to his mother-in-law’s house. His wife’s lover was sitting in the den of his mother-in-law’s house, reading. Either the defendant or the lover said, “ ‘Hi, Bill.’ ” (Id. at p. 409.) Then the defendant shot him five or six times. (Ibid.) On these facts, the Supreme Court reversed the defendant’s second degree murder conviction for insufficient evidence, noting that in light of the wife’s affair and her refusal to either agree to divorce or forgo seeing the victim, “the sight of the victim in his mother-in-law’s home was a great shock to the defendant who had not expected to see him there or anywhere else. . . . There was ample, uncontradicted, evidence that defendant was a man of excellent character; that he was mentally and emotionally exhausted and was white and shaking. It appears to us, as a matter of law, that under the circumstances here presented there was adequate provocation to provoke in the reasonable man *1487 such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection . . . .” (Id. at pp. 413-414.)
In another relevant case, People v. Berry (1976) 18 Cal.3d 509 [134 Cal.Rptr. 415, 556 P.2d 777] (Berry), defendant, age 46, killed his wife, age 20. The victim lived with the defendant from July 13 to July 26, and during the period she “continually provoked defendant with sexual taunts and incitements, alternating acceptance and rejection of him. This conduct was accompanied by repeated references to her involvement with another man; it led defendant to choke her on two occasions, until finally she achieved her unconscious desire and was strangled.” (Id. at p. 514.) Under Berry’s provocation evidence, even a cooling off period of 20 hours would not cancel the “long course of provocatory conduct.” (Id. at p. 516.)
Finally, in People v. Wharton (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290] (Wharton), the defendant hit his girlfriend in the head with a blunt instrument, killing her. He told police they were both drinking heavily and arguing. She threw a book at him and he hit her while in a rage. He then tried to kill himself by inhaling gas from the oven and taking pills. (Id. at p. 543.) The defense presented evidence of the defendant’s volatile relationship with the victim; weeks before the killing, the defendant confided to two psychiatrists that “tension between defendant and Smith was building and . . . defendant felt he was losing control of his anger toward Smith.” (Id. at p. 572.)
The jury was instructed on basic principles of provocation and heat of passion manslaughter, but the Wharton court held the trial court also should have given a defense-requested instruction that “legally adequate provocation could occur over a considerable period of time.” (Wharton, supra, 53 Cal.3d at p. 571.) From Borchers, Berry and Bridgehouse, the Wharton court distilled the principle that “[t]he key element is not the duration of the source of provocation but ‘ “whether or not defendant’s reason was, at the time of his act, so disturbed or obscured by some passion ... to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.” ’ ” (Id. at pp. 569-570, quoting People v. Rich, supra, 45 Cal.3d at p. 1112.) “It was defendant’s theory at trial that no single action on the part of the victim provoked the fatal blow but that the book-throwing incident was merely the culmination of his pent-up frustration and anger emanating from his ongoing dysfunctional relationship with the victim. In other words, his defense theory at trial was that he killed after enduring provocatory conduct by the victim over a period of weeks.” (Wharton, at p. 571; see People v. Thompkins (1987) 195 Cal.App.3d 244, 256-257 & fn. 7 [240 Cal.Rptr. 516].)
*1488 Against this factual and legal background, the trial court’s reliance on Steele, Gutierrez, and Rich was misplaced. In People v. Steele, supra, 27 Cal.4th 1230, the defense conceded there was “no evidence of provocation in the sense of a quarrel,” but argued “provocation” was just a “ ‘shorthand expression’ ” for killing while subjectively under a “heat of passion” for which there was abundant evidence. (Id. at p. 1251.) The Steele court rejected the argument. (Ibid.) Here, by contrast, there was concrete evidence of both provocation from the victim — Green’s repeated threats to take custody of their son away from defendant — and her angry, confused response to those threats, both of which were corroborated by prosecution witnesses.
People v. Gutierrez, supra, 45 Cal.4th 789, is similarly inapposite in this situation. Gutierrez did not involve a course of provocatory conduct by the victim over a considerable period of time. On the other hand, numerous well-established precedents recognize that “provocative conduct by the victim may be physical or verbal.” (People v. Manriquez (2005) 37 Cal.4th 547, 583-584 [36 Cal.Rptr.3d 340, 123 P.3d 614], citing People v. Valentine (1946) 28 Cal.2d 121, 138-139 [169 P.2d 1]; Berry, supra, 18 Cal.3d at p. 515; People v. Lee (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001]; People v. Beltran, supra, 56 Cal.4th at pp. 948-949.)
The concurrence agrees the evidence here shows “a course of provocation that built up over time.” (Cone, opn., post, at p. 1502.) It also acknowledges the Bridgehouse-Borchers-Berry-Wharton line of cases. But it disagrees that case law gives rise to a need for either a manslaughter or second degree murder provocation instruction here, because it views those cases as dependent upon a showing that “the built-up provocation culminated in some event involving the killer and victim that . . . caused a passionate or immediate reaction resulting in the killing.” (Ibid.) The concurrence points out that in Borchers, immediately before he shot her, the girlfriend gave the defendant her gun and dared him to shoot her. But, as quoted earlier, the Borchers court did not view that taunt in isolation as an act that triggered a sudden quarrel. Rather, it viewed the evidence “as a whole” and treated the final taunt (final because he killed her) as part of “Dotty’s long continued provocatory conduct.” (Borchers, supra, 50 Cal.2d at pp. 328-329.)
Similarly, in Berry, the defendant fatally strangled his wife in an uncontrollable rage when she started screaming and would not stop. (Berry, supra, 18 Cal.3d at pp. 513-514.) Relying on Borchers, the Berry court ruled the defendant was entitled to a manslaughter instruction on these facts, not because he immediately killed his wife upon hearing her scream (nor upon her preceding statement, “ T suppose you have come here to kill me’ ”), but because there was “ample evidence in the record to support the conclusion *1489 that this passion was the result of the long course of provocatory conduct by Rachel.” (Berry, at pp. 514, 516.) Likewise, the book-throwing incident in Wharton was not the reason our Supreme Court ruled the trial court should have given the defendant’s pinpoint instruction that provocation can develop over a considerable period of time. We agree with the concurrence that, standing alone, each of the instigative acts described above — or the diaper and disappearing clothing discovery in this case — are too trivial to support heat of provocation/passion instructions. However, we disagree that the provocatory course of conduct theory of heat of passion/provocation always requires the existence of some instigative final act, however trivial, before it is worthy of consideration by the jury.
The concurrence stresses that, in this case, “there still must be something when the killing occurs — certainly something more than . . . just quietly sitting in [one’s] car, by [one’s] home, minding [one’s] own business — that stimulates the passionate emotion or immediate response of the killer.” (Cone, opn., post, at p. 1504.) But, in Bridgehouse, the victim — the wife’s lover— was just sitting in the defendant’s mother-in-law’s den, reading the paper, when defendant shot him dead. Our Supreme Court reduced Bridgehouse's second degree murder conviction to voluntary manslaughter because the sum total of the circumstances proved, as a matter of law, the existence of adequate provocation and heat of passion. (Bridgehouse, supra, 47 Cal.2d at p. 414.) The concurrence questions the continued vitality of Bridgehouse because it was the wife's conduct that was provocatory, not the victim’s, and the provocation must come from the victim, but we are not so sure. The facts recited in the opinion make clear Bridgehouse considered the conduct of both his wife and her lover reprehensible and provocatory. “There is testimony by defendant’s neighbors that Bahr’s car was often seen standing all night, or the major portion thereof, in front of the Bridgehouse home.” (Bridgehouse, at p. 408.) “The record also showed that defendant’s wife and Bahr had a joint bank account which was known to defendant; that one of defendant’s charge accounts had been used to buy a gift for Bahr; that defendant had found Bahr’s clothing hanging in the closets of his home .... When defendant was asked what his feeling was concerning Bahr, he answered: T tried very much to make a non-entity out of him in my own mind, in my mind’s eye. I knew from various sources that he was not the kind of person whom I could consider an upright, solid citizen.’ ” (Bridgehouse, at p. 411.) In any event, to date Bridgehouse remains one of the foundational cases establishing the provocatory course of conduct theory of manslaughter in California, and it has never been questioned or disapproved on that ground by the California *1490 Supreme Court.[10] We therefore think it retains precedential value. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)
The concurrence does not consider Green’s act of bringing their son home one day later than they had agreed, in a diaper, dressed in clothes other than those she sent with him for the visit, a sufficiently provoking instigatory event because (1) it occurred on Monday afternoon, February 22, and defendant shot Green shortly after midnight on Tuesday, February 23; (2) it did not trigger in defendant a sufficiently passionate emotion; and (3) even if it did cause a passionate response, “insufficient evidence was presented that [Wright] was still under the influence of that emotion when she fired the first shot.” (Cone, opn., post, at p. 1502, fn. 1.) But the evidence showed defendant spent Sunday and Monday stewing in her own juices, debating whether to kill herself or talk to Green first, then kill herself. In Berry, supra, 18 Cal.3d 509, our Supreme Court did not consider the 20 hours the defendant waited in the apartment for Rachel’s return too lengthy a cooling off period to allow for jury consideration of a manslaughter verdict, in light of the “long course of provocatory conduct” lasting two weeks. (Berry, at p. 516.) In our view, the question in this case — whether eight hours between the last provocatory act and the killing constituted sufficient time for passion to subside and reason to return, after a provocatory course of conduct lasting several months — like basic questions about the existence of provocation and its effect, if any, upon the defendant’s mind — is a question of fact for the jury. (People v. Taylor (1961) 197 Cal.App.2d 372, 380 [17 Cal.Rptr. 233]; People v. Wickersham (1982) 32 Cal.3d 307, 327 [185 Cal.Rptr. 436, 650 P.2d 311], overruled on another point in People v. Barton, supra, 12 Cal.4th at p. 201.)
The concurrence also does not consider the evidence here jury-worthy because defendant “did not kill as an immediate response to provocatory conduct” (cone, opn., post, at p. 1502, fn. 1). The concurrence stresses the immediacy of the response in reliance upon the following statement in People v. Wickersham, supra, 32 Cal.3d at page 329: “[W]here the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately, the trial court is required to give instructions on second degree murder under this theory.” (Italics added.) The Wickersham court explained that the evidence of heated words and a struggle in that case could have raised a reasonable doubt about whether the defendant planned the killing in advance; or the jury could have found that the defendant did not form the *1491 intent to kill until after the victim came toward her and tried to grab the gun; or the jury could have found the defendant did not premeditate “but rather acted upon a ‘sudden and unconsidered impulse[].’ ” (Wickersham, at pp. 329-330.)
Wickersham's discussion relied on People v. Valentine, supra, 28 Cal.2d 121, for the principle that “provocation which is not ‘adequate’ to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation.” (Id. at p. 132.) Valentine arguably did not involve an immediate response to provocation, although it did involve an argument. (Id. at pp. 127-129.) The defendant testified he went back to his house to get his gun between the first and last confrontation with the victim, and shot the victim during an argument after the victim swung at him. (Id. at p. 130.) Valentine labeled “manifestly erroneous” an instruction that “ ‘[i]t is not less murder because the act is done suddenly after the intent to commit the homicide is formed. It is sufficient that the malicious intention precedes and accompanies the act of homicide.’ (Italics added.)” (Id. at p. 134.) Thus, Valentine — and by extension Wickersham— stand, at most, for the proposition that provocation can negate the inference of malice arising from an act done immediately after the intent to kill is formed. Neither Valentine nor People v. Wickersham, supra, 32 Cal.3d 307, address provocation in the context of a long period of provocatory conduct or, in our view, imposed an immediacy requirement in that scenario.
Finally, with a nod to footnote 8 in the majority opinion, the concurring opinion dismisses Borchers, Bridgehouse and Berry as cases based on “obliquely sexist reasoning” and questions whether “if the defendants in these cases had been women” the courts would have “so quickly concluded that ordinary people in their position would have had their judgment eclipsed by passion due, in significant part, to their partners’ infidelity.” (Cone, opn., post, at p. 1504, fti. 2.) The concurrence concludes the evidence here was not jury-worthy because “Green’s conduct before the shooting was insufficient to prompt a passionate response in any reasonable person, woman or man, in Wright’s circumstances.” (Ibid.) But we think these observations miss the mark. The question is not whether neither male nor, female killers — or both — should be able to have a jury consider whether an intimate partner’s infidelities can provoke in them a killing rage, but whether this jury should have been able to consider whether Green’s provocatory course of conduct, and the fear, depression, and sadness, rather than rage and anger, that resulted from it, could have driven Wright to act rashly, even though those provocative acts and emotions may be different from the ones that may drive men to *1492 act rashly. (Gruber, A Provocative Defense, supra, 103 Cal. L.Rev. at p. 285 & fns. 80, 81, 82, 83; Borchers, supra, 50 Cal.2d at pp. 328-329.)[11]
As discussed above, the trial court was willing to instruct on provocation only if the jury was also instructed that “if the defendant was the initial aggressor, legal and predictable conduct by a victim resisting the defendant’s aggression is not provocation sufficient to reduce first degree murder to second degree murder, or to reduce a murder charge to voluntary manslaughter. . . . Legal conduct includes a victim’s self-defense as explained in Instruction 505A.” (Italics added.) As noted elsewhere, the trial court’s view of a victim’s right to self-defense is not supportable; nor is the court’s cross-pollination of the law governing provocation with “initial aggressor” rules. The refusal to instruct on provocation without including the self-defense gloss was therefore error. In addition, we conclude the kernel principle, that a resisting victim’s predictable conduct cannot establish the provocation needed for voluntary manslaughter, had no application to defendant’s theory of provocation in this case.
The “predictable conduct” principle apparently arises from People v. Jackson (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], overruled on another point in In re Sassounian (1995) 9 Cal.4th 535, 545, footnote 6 [37 Cal.Rptr.2d 446, 887 P.2d 527], and People v. Cromer (2001) 24 Cal.4th 889, 901, footnote 3 [103 Cal.Rptr.2d 23, 15 P.3d 243]. The Jackson court distinguished the provocative course of conduct and heat of passion present in Berry, supra, 18 Cal.3d 509 from the case before it, where the record indicated “that defendant may have become enraged and brutally attacked and killed one of his elderly victims because she awakened during the burglary and began to scream. No case has ever suggested, however, that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter.” (Jackson, at p. 306.)
*1493 In People v. Rich, supra, 45 Cal.3d 1036, the court applied the Jackson principle to reject the assertion that “the victims’ resistance to being raped could have provoked defendant to explode.” (Id. at p. 1112; see People v. Dixon (1995) 32 Cal.App.4th 1547, 1554 [38 Cal.Rptr.2d 859] [victim’s refusal to have sex after having been given drugs].)
In People v. Balderas (1985) 41 Cal. 3d 144, 196 [222 Cal.Rptr. 184, 711 P.2d 480], the asserted provocation was the victim’s resistance to being robbed. In People v. Blacksher (2011) 52 Cal.4th 769, 833 [130 Cal.Rptr.3d 191, 259 P.3d 370], the asserted provocation for shooting the victim was her predictable response of coming to the aid of another shooting victim. In People v. Kanawyer (2003) 113 Cal.App.4th 1233, 1247 [7 Cal.Rptr.3d 401], the asserted provocation came from the victim’s predictable conduct of screaming for the intruder to leave his house and for his wife to call the police. In People v. Souza (2012) 54 Cal.4th 90, 117 [141 Cal.Rptr.3d 419, 277 P.3d 118], the victim was shot after he stood up from the couch and reached for one of three unknown armed men who forcibly entered the house. In People v. Thomas (2012) 53 Cal.4th 771, 781 [137 Cal.Rptr.3d 533, 269 P.3d 1109], the defendant placed his gun between the victim’s eyes and threatened “to ‘blow [his] brains out,’ ” then shot the victim in a rage after the victim grabbed for his gun. In each case, the victims’ resistance was to the defendants’ felonious conduct that preceded the lethal assault. More importantly, in all of these cases, no theory of provocation was presented at trial — no sudden quarrel, no simmering response to a provocatory course of conduct — other than the victims’ predictable reactions to the defendants’ assaults; thus, there was no rational basis for a jury finding of provocation. It is true that in both Blacksher and Kanawyer there was evidence of a history of bad blood between the mentally ill defendants and their victims, who were family members, but neither court tied its discussion of the predictable conduct principle to that history or to the defense theory that the defendant killed his victim in a heat of passion aroused by a history of provocative acts by the victim.
None of these cases suggests the “predictable conduct” principle should preclude the jury’s consideration of a defense theory that defendant’s heat of passion was ignited by a series of provocative acts on the part of the victim over a considerable period of time.
The concurrence does not buy defendant’s argument, raised for the first time in the reply brief, that “ ‘[biased on the history of violence between the parties, heat-of-passion may have come into play in [her] decision to fire the second and third rounds.’ ” (Cone, opn., post, at p. 1505.) We wish to make clear, we do not buy it either. In the first place, as discussed elsewhere, there was no admissible evidence of violence between the parties. Furthermore, *1494 even if there were a factual predicate for it, the argument would be barred by proper application of the predictable conduct cases discussed above. For that reason, we think if the trial court’s proposed instruction had been limited to the fatal confrontation in the parking lot, or accompanied by a Wharton instruction (Wharton, supra, 53 Cal.3d 522) that provocation can develop over a considerable period of time, the court’s instruction might have been acceptable.[12] What was not acceptable was depriving defendant of her only defense to murder, since her only other defense — intoxication and mental disease — could not reduce murder to voluntary manslaughter. (People v. Saille (1991) 54 Cal.3d 1103, 1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) In sum, our independent review of the law and the facts leads to the conclusion it was error for the court to refuse to give requested manslaughter instructions premised on heat of passion/provocation in this case.
G. The Court’s Failure to Instruct on Provocation and Second Degree Murder Was Error.
It was also error to refuse a requested instruction that if the provocation is insufficient to reduce a murder to manslaughter, it may nevertheless reduce the murder from first to second degree. “Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of both premeditation and malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation.” (People v. Thomas (1945) 25 Cal.2d 880, 903 [156 P.2d 7]; see People v. Carasi (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d 616]; People v. Wickersham, supra, 32 Cal.3d at p. 329; People v. Valentine, supra, 28 Cal.2d at p. 132.) “The existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to premeditation and deliberation in forming the specific intent to kill, as well as in regard to the existence of malice (Pen. Code, § 188), constitute questions of fact for the jury and they should have been so advised.” (Thomas, at pp. 903-904; see CALCRIM No. 522; CALJIC No. 8.71.)
*1495 The evidence adduced at trial about the long-simmering conflict between defendant and Green over their son’s care and custody could have raised a reasonable doubt about the existence of premeditation and deliberation, one of the two theories of first degree murder on which the jury was instmcted. Defense counsel properly objected to the trial court’s revision of CALCRIM No. 522, which would have misdirected the jury to focus its attention solely on defendant as the initial aggressor, rather than permitting the jury to consider whether defendant’s conduct was a rash response to Green’s provocatory conduct with respect to their son.[13]
The question remains whether the errors were prejudicial.[14] Reversal is required only if “ ‘the court, “after an examination of the entire cause, including the evidence,” is of the “opinion” that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.’ ” (Wharton, supra, 53 Cal.3d at p. 571, quoting People v. Watson, supra, 46 Cal.2d 818, 836; see People v. Breverman, supra, 19 Cal.4th at p. 165; People v. Rogers (2006) 39 Cal.4th 826, 868 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Under Watson, the court “may consider . . . whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak,” that there is no reasonable probability the jury would have decided differently had the trial court instmcted on the lesser included offense. (People v. Breverman, at p. 177.)
The Attorney General argues any error in failing to instruct on heat of passion and provocation was harmless because “the evidence of heat of passion due to provocation was relatively weak. . . . [T]here was no direct evidence of appellant’s actual heat of passion or that Green actually provoked appellant’s shooting.” She also argues any failure to instruct was harmless by *1496 virtue of the overwhelming evidence of lying in wait, and the jury’s lying-in-wait special-circumstance finding.
Although the evidence of defendant’s actual state of mind was indirect, there was enough evidence from sources other than or in addition to defendant’s testimony from which a properly instructed jury reasonably could have concluded that defendant in fact was angry with Green (despite her protestations to the contrary), “wasn’t thinking,” and acted under the actual stress and provocation of Green’s threats to take custody of her son away from her when she shot him. (People v. Wickersham, supra, 32 Cal.3d at p. 328; People v. Barton, supra, 12 Cal.4th at p. 202.) If not sufficient to negate malice and reduce the offense to manslaughter, it could well have been sufficient, especially in combination with the evidence of intoxication and mental disease, to negate premeditation and deliberation and reduce the offense to second degree murder. However, the evidence defendant acted in a heat of passion was relatively weak compared with the evidence that knowing Green’s work schedule and post-work routine, she drove to the Pelican Loop parking lot and waited for him to come home, whereupon she sneaked up on him unaware and shot him while he was in his car.
Moreover, the jury was instructed in connection with premeditation and deliberation that “[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.” (CALCRIM No. 521.) It was also instructed on lying in wait as an alternative theory of first degree murder liability and returned a true finding on the special circumstance allegation that she killed Green “by means of lying in wait.” (CALCRIM No. 728.) “[Ljying in wait ‘[is] the functional equivalent of proof of premeditation, deliberation, and intent to kill.’ [Citation.] Thus, a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation . . . .” (People v. Hardy (1992) 2 Cal.4th 86, 162 [5 Cal.Rptr.2d 796, 825 P.2d 781]) or intent to kill (People v. Ruiz (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854]). Provocation cannot negate first degree murder by lying in wait. (People v. Battle (2011) 198 Cal.App.4th 50, 75 [129 Cal.Rptr.3d 828].)
In this case, even if the jury theoretically could have found that provocation or heat of passion negated premeditation and deliberation, its special circumstance finding demonstrated beyond a reasonable doubt that it did not necessarily, or solely, rely on premeditation and deliberation to find first degree murder.[15] In addition, the jury was instructed that intoxication and *1497 mental disease could be considered for the limited purpose of deciding whether, at the time of the shooting, defendant acted with intent to kill, premeditation and deliberation, intended to make a surprise attack as required for first degree murder on a lying-in-wait theory, and whether defendant intended to kill Green by taking him by surprise as required for the special circumstance of lying in wait. (CALCRIM Nos. 625, 3428.) Despite these instructions, the jury rejected the evidence showing those mental states were affected by defendant’s mental impairments, strongly suggesting the jury also would have rejected the evidence those mental states were affected by heat of passion. In our view, the failure to give an instruction relating provocation to second degree murder could not have been prejudicial in this case.
To be sure, before there can be a lying-in-wait finding, there must be a murder finding. “To prove first degree murder of any kind, the prosecution must first establish a murder within section 187 — that is, an unlawful killing with malice aforethought. [Citations.] Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait, or ‘by any other kind of willful, deliberate, and premeditated killing.’ ” (People v. Stanley (1995) 10.Cal.4th 764, 794 [42 Cal.Rptr.2d 543, 897 P.2d 481].)
Here, the jury was instructed it could consider intoxication and mental disease “only in a limited way” that did not include their effects on implied malice. (People v. Saille, supra, 54 Cal.3d at p. 1117.) Unlike intoxication and mental disease, provocation and heat of passion can negate both implied malice and intent to kill. (People v. Lasko, supra, 23 Cal.4th at pp. 108-111; People v. Blakeley, supra, 23 Cal.4th at pp. 89, 91; People v. Breverman, supra, 19 Cal.4th at p. 154.) We are aware the first jury, which heard virtually the same evidence and was instructed on provocation/heat of passion as well as intoxication and mental disease, wrestled with implied malice in this case, and ultimately was unable to agree on a murder verdict. However, from its questions, it appears the first jury’s concerns may have been prompted by the connection between implied malice and intoxication and mental disease, rather than between implied malice and provocation and heat of passion. (See fn. 2, ante.)
This jury, however, must have believed the evidence showed defendant shot Green with “a state of mind equivalent to deliberation or premeditation” in order to return a true finding on the lying-in-wait special-circumstance finding. (CALCRIM No. 728.) That finding cannot be reconciled with a finding she also lacked malice because Green’s conduct provoked in her an *1498 “emotion so intense that an ordinary person would simply react, without reflection.” (People v. Beltran, supra, 56 Cal.4th at p. 949.) Also, our Supreme Court has found that a lying-in-wait special-circumstance finding renders the failure to instruct on provocation/heat of passion manslaughter harmless error. (People v. Cruz (2008) 44 Cal.4th 636, 665 [80 Cal.Rptr.3d 126, 187 P.3d 970].) In short, while the jury should have been instructed on provocation and heat of passion, after close examination of the evidence and the jury’s findings, we cannot conclude it is reasonably probable a result more favorable to defendant would have been reached in the absence of the error. (People v. Watson, supra, 46 Cal.2d at p. 836; People v. Cruz, at p. 665 [intentional murder, perfecting escape and lying-in-wait special-circumstance findings “negate any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories of manslaughter”].)
H.-J.*
DISPOSITION
The judgment is affirmed.
Margulies, J., concurred.

 Unless otherwise specified, all statutory references are to the Penal Code.
2 As relevant here, the jury asked:
“(1) Regarding #3471 Right to self-defense: mutual combat or initial aggressor: Must it be shown beyond a reasonable doubt that both items are true, or is it sufficient that both are reasonably possible? [¶] (2) Does #3471 apply to imperfect self-defense?
“Regarding instruction 570: [¶] If we assume that the defendant fired the first shot, may any of the victim’s subsequent actions be considered provocation?
“La. If a homicide is determined not to be done in self-defense or defense of another (per instruction 505), is it necessarily unlawful? [¶] Lb. I.e., are there other forms of lawful homicide that could apply in this case? [¶] 2.a. Is it possible for an unlawful homicide to not meet the requirements for either murder or manslaughter that have not been presented to us? [¶] 2.b. If so, would that mandate a verdict of ‘not guilty’?
“Regarding instruction 520, items #3 + 4 under implied malice: [¶] I. In item #3, does ‘knew’ refer to knowledge gained beforehand or awareness of the moment? [¶] 2. Can you elaborate on the meaning of item #4, specifically the meaning of ‘conscious disregard’?
“We the jury request the following: [Ajdditional arguments and clarification regarding: [¶] -instruction 520, implied malice, in particular items #3 + 4, including interpretation of the wording therein. [¶] -instruction 521 B. Lying in Wait.
“Instruction 500 states, ‘If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter.’ This would seem to be untrue if we are allowed to: [¶] 1. Rule out lawful homicide in self-defense and manslaughter by imperfect self-defense (as initial aggressor); [¶] 2. Rule out manslaughter by heat of passion (since not provoked); AND [¶] 3. find that the evidence fails to prove the required elements of malice aforethought (due to mental state). [¶] Please explain this apparent contradiction.
“Implied malice appears not to require intent to kill, deliberation, premeditation, or lying in wait. Given the limitations listed in instruction 625 [Voluntary Intoxication: Effects on Homicide Crimes], may voluntary intoxication be considered when deliberating implied malice? [¶] If not, and if we believe that voluntary intoxication contributed to the defendant’s *1466 mental state, then how exactly are we to ‘not consider’ it? [¶] Are we expected somehow to speculate as to what her mental state would have been in the absence of intoxication?”

 Allen v. United States (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154], The court gave an instruction approved in People v. Moore (2002) 96 Cal.App.4th 1105, 1118-1122 [117 Cal.Rptr.2d 715].

See footnote, ante, page 1461.

 The court’s modified versions of CALCRIM Nos. 571 (voluntary manslaughter: heat of passion) and 522 (provocation: effect on degree of murder) would have included the following italicized language: “The defendant killed someone because of a sudden quarrel or in the heat of passion if: 1. The defendant was provoked by the victim’s conduct that was not a legal or predictable response to initial aggression by the defendant.” (CALCRIM No. 570.) “[I]f the defendant was the initial aggressor, legal and predictable conduct by a victim resisting the defendant’s aggression is not provocation sufficient to reduce first degree murder to second degree murder, or to reduce a murder charge to voluntary manslaughter. . . . Legal conduct includes a victim’s self-defense as explained in Instruction 505A.” (CALCRIM No. 522.)

 Some feminist scholars posit that jurists inevitably infuse objectively reasonable provocation with male attributes and may fail to accommodate “the emotions that drive women to kill — fear, depression, and sadness rather than anger. Additionally, the ways in which women develop these emotions may differ from the ‘snapped’ scenario.” (Gruber, A Provocative Defense, supra, 103 Cal. L.Rev. at p. 285, fns. omitted.) Thus, “provocation law should accept a variety of emotions as constituting ‘passion,’ and permit women to argue that provocation can develop over time. [Fn. omitted.]” (Ibid.; see id. at fns. 80, 81, 82, 83.)

 Defense counsel argued: “[I]t should come as no surprise that what I tell you your focus should be is going to be completely different from what [the prosecutor] has told you your focus should be. [¶] And she said that this is about Mr. Green .... [¶] ... It’s not about Mr. Green. It’s about her. It’s about delving into her mind. . . . [S]he did kill him, but there’s more to focus on than the act.
“[Y]ou have to go to that place where you have a person who is in a state where she’s ready to kill herself but is thinking he’s going to take away my son. I’m going to talk to him first. . . . [¶] But, again, at this point as she told you she wasn’t planning to kill him, but’s [j/c] what she was thinking is, I want to go out there and see — I need to go and see if he’s serious about taking [my son] away from me, and I want him to know that I’m serious about it. Does that make any sense? [¶] I asked her, this thing that she was thinking at the time, no, it doesn’t make any sense to her now. But at the time — and remember that note about her feelings, about how she had never embarrassed him . . . . [¶] Think back, by the way, to the testimony of Natasha Griffith when I asked her . . . [¶] . . . [¶] ‘Well, did he ever — did he ever criticize her parenting skills?’ [¶] ‘Yes.’ [¶] And just think. Here’s a woman who loves her child, and she was cross-examined pretty harshly on that, on the things that she was doing in being a bad mom. But every day she gets up, she goes to work even though she’s depressed. She takes care of her kids. She wants to kill herself. She keeps living, and she takes care of her kids. [¶] And she’s not thinking when she goes out there and is thinking, I want him to know that I’m serious. I don’t want him to laugh at me. 1 want him to know that I’m serious, and I want to know if he’s serious about trying to take [my son] away from me. So she goes there and she gets there.
“She wasn’t thinking, I’m going to attack him, I’m going to kill him, I’m going to catch him off guard. She was thinking up until the moment that it happened, I wanted to talk to him and I wanted him to know that I was serious. And if she hadn’t been in this state, it wouldn’t have happened.”

 People v. Blakeley (2000) 23 Cal.4th 82, 89 [96 Cal.Rptr.2d 451, 999 P.2d 675] and People v. Lasko, supra, 23 Cal.4th 101, 110 disapproved dictum in Bridgehouse, supra, 47 Cal.2d 406 that voluntary manslaughter requires an intent to kill.

 In the related context of battered women’s syndrome evidence (renamed “ ‘intimate partner battering’ ” to make it gender neutral (Evid. Code, § 1107, subd. (f)), case law recognizes that supporting instructions on self-defense are appropriate when the evidence shows a woman killed her intimate partner after being battered by him over a long period of time, even when the victim was asleep, as in People v. Arts (1989) 215 Cal.App.3d 1178 [264 Cal.Rptr. 167], disapproved on another point in People v. Humphrey (1996) 13 Cal.4th 1073, 1089 [56 Cal.Rptr.2d 142, 921 P.2d 1], The objective reasonableness required for self-defense is not all that different from the objective reasonableness required for provocation, as our Supreme Court recognized in People v. Enraca (2012) 53 Cal.4th 735 [137 Cal.Rptr.3d 117, 269 P.3d 543] when it quoted Humphrey to illustrate the reasonable person standard applicable to provocation. “The standard is not the reaction of a ‘reasonable gang member.’ ” (Enraca, at p. 759, quoting People v. Humphrey, at p. 1087.)

 We are aware that amplifying instructions such as the one discussed in Wharton, supra, 53 Cal.3d 522 need only be given upon request. (People v. Guiuan (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928].) In our view, the “predictable conduct” instruction contemplated by the court here also was more akin to an amplifying instruction than to a general principle of law on which the court must instruct sua sponte. “Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly.” (People v. Castillo (1997) 16 Cal.4th 1009, 1015 [68 Cal.Rptr.2d 648, 945 P.2d 1197].) In this case, where there was considerable evidence of provocatory acts over a period of time, a further amplifying instruction would have been required to correctly set the parameters of the predicable conduct principle.

 We do not agree with the concurrence that “[w]hether the evidence of Green’s conduct after Wright shot into his car was sufficient to require a provocation instruction for purposes of a second degree murder is a closer call.” (Cone, opn., post, at p. 1506.) In our view, any instruction based on the shots fired by Wright after Green got out of his car would be subject to the predictable conduct rule of the Jackson-Rich line of cases, regardless of her subjective state of mind.

 The Courts of Appeal are currently debating whether the erroneous failure to instruct on provocation/heat of passion manslaughter is evaluated for prejudicial error under People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243], or Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], (See People v. Thomas (2013) 218 Cal.App.4th 630, 633, 641-645 [160 Cal.Rptr.3d 468]; People v. Millbrook, supra, 222 Cal.App.4th at pp. 1145-1146; People v. Peau (2015) 236 Cal.App.4th 823, 830-831 [187 Cal.Rptr.3d 237].) In this case, unlike in Thomas, Millbrook, and Peau, defendant has not argued Chapman is the correct standard of reversal. It would not be appropriate for this court to weigh in on the debate when the issue has not been fully briefed by the parties. (People v. Moye (2009) 47 Cal.4th 537, 558, fn. 5 [98 Cal.Rptr.3d 113, 213 P.3d 652].)

 To the extent defendant argues the assumed collateral estoppel error discussed in part B of this opinion is federal constitutional error because it contributed to the removal of material factual questions from the jury (Blakely v. Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]), we also find the jury’s lying-in-wait special circumstance finding resolved *1497 any such factual questions against defendant and rendered any such error harmless beyond a reasonable doubt. (Washington v. Recuenco (2006) 548 U.S. 212, 218-222 [165 L.Ed.2d 466, 126 S.Ct. 2546].)

See footnote, ante, page 1461.

 Like People v. Borchers, supra, 50 Cal.2d 321 and People v. Berry, supra, 18 Cal.3d 509, People v. Bridgehouse, supra, 47 Cal.2d 406 includes obliquely sexist reasoning. If the defendants in these cases had been women, would the courts have so quickly concluded that ordinary people in their position would have had their judgment eclipsed by passion due, in significant part, to their partners’ infidelity? The majority suggests in footnote 8 that passion may develop and be expressed differently in women. (Maj. opn., ante, at p. 1483, fn. 8.) But even if this is so, I would still conclude that Wright was not entitled to a heat-of-passion instruction because Green’s conduct before the shooting was insufficient to prompt a passionate response in any reasonable person, woman or man, in Wright’s circumstances.