Filed 8/2/24  P. v. Swanson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097535 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE005516) |
| v. | |
| FRANK SWANSON, | |
| Defendant and Appellant. | |

Defendant Frank Swanson killed his grandfather by hitting him in the head with a baseball bat.  Defendant appeals from his conviction of second degree murder.  He contends the trial court erred by not instructing the jury on heat of passion voluntary manslaughter and by not answering jury inquires adequately.  He also contends his trial counsel rendered ineffective assistance when he did not object to the prosecutor's misstatement of involuntary manslaughter law during closing argument.

We find no prejudicial error and affirm the judgment.

1

FACTS AND PROCEDURAL BACKGROUND

A.      Prosecution's case

1.      Events leading up to the murder

Lea R. lived with defendant's grandparents, Pete and Belinda S., as a caregiver. She cared for 76-year-old Belinda. Belinda suffered from Alzheimer's and other health issues and was bedridden. Lea moved in to help 78-year-old Pete take care of her.

Defendant moved into his grandparents' home in November 2019. Lea and defendant got along well when he first moved in, and there were a lot of good days leading up to March 2020. But Pete and defendant would argue sometimes. At one point, Pete asked defendant to move out to the boat in back so he would not disturb his grandmother if he was loud coming in and out.

Lea was aware that defendant was being treated for his mental health. She heard him say that people in the attic, on the roof, or in cars driving by were taking food out of his stomach. He incorrectly believed Lea poisoned food she prepared, and he refused to eat it. He would eat only food that he bought. He said he had air bubbles in his stomach from the poison, and he would throw up everything he ate because he thought he was being poisoned. He occasionally yelled at cars going by.

Defendant was taking medications for his mental health. In the week leading up to the murder, Lea noticed empty medication bottles in the bathroom trash can and knew defendant had flushed the medications down the toilet.

About one week before the murder, defendant was being loud. Lea asked him not to yell in front of Belinda because he would scare her. Defendant said he did not have to listen to Lea because he was a grown adult. Pete told defendant he did not need to talk to Lea that way. He said, "She's here to take care of your grandmother and . . . you need to be nice. And if you can't, then just go." Defendant got angry, started yelling, slammed the door, and took off.

2

On another occasion, defendant was being loud and obnoxious, and Lea's dog barked at him. Defendant told Lea to "shut that dog up or I'm going to kill it." Lea told him her dog was scared, but he said he did not care. Dogs drove him crazy. Hearing this, Pete told defendant to knock it off or get out. Pete would tell defendant to leave so defendant could calm down and things would be quiet in the house.

Three or four days before the murder, defendant received a letter informing him he had been overpaid in Social Security benefits and would not receive his payments. Defendant started screaming and yelling that they were taking his money away and he would not be able to live. Pete told him to calm down; they would take care of it and the government would take only so much out of his monthly check. But defendant "went crazy," slamming doors and yelling.

He called the Social Security office and cussed at the employee. Sheriff's deputies arrived at the house and told Pete that defendant had threatened the Social Security worker. They spoke with defendant, and he calmed down.

Around 10:00 p.m., March 25, 2020, defendant went outside and slammed the door. Pete went out and told him to come in; it was time to go to bed. Defendant got angry and told Pete he was a grown man and Pete could not tell him what to do. He was not going in if he did not want to. Lea told Pete just to let defendant stay outside. He would lock the door when he came in, as he always did. Pete kept "saying stuff," and Lea kept saying to let him be. At one point, defendant told Pete that if he (Pete) wanted to hit him, to just do it. Pete said he did not want to hit him. He wanted defendant just to "act like the good kid" he was. Pete let defendant stay outside, and he went in and went to bed.

During the night, Lea awoke to Pete and defendant arguing in the living room. They argued over defendant being loud. Pete told defendant to get out and leave if he did not want to comply with the rules. Defendant said, "[T]his is my house. You get out. I

3

own this place, and . . . you all can just get out." (Lea testified that Pete and Belinda owned the home.)

At approximately 4:00 a.m., March 26, Lea heard defendant slamming doors and yelling out his room's window at passing cars. She woke up Pete and called 911. Deputies arrived and told Pete and Lea to get a restraining order and a move-out order to get defendant out of the house. Until they had a restraining order, there was nothing the deputies could do.

The deputies told defendant to go in his room, lie down, turn on his stereo quietly, and go to sleep. Defendant went in his room, closed the door, and turned the stereo on "full blast."

Pete went into defendant's room and told him to turn it down and knock it off or he could leave. Defendant told Pete to get out of "his" house and leave him alone. The deputies had told him to listen to the stereo, and that was what he was doing.

Pete came out to the living room and told Lea he felt he could not breathe. He was too angry to go back to his room to sleep. Lea told him to sit in the chair, and eventually he fell asleep.

At 6:00 a.m., defendant resumed his behavior. He screamed, yelled, slammed doors, and ran in and out. Pete got up and told him to knock it off and to leave if he could not be quiet. His grandmother was sleeping. Defendant said it was his house and he could do whatever he wanted. Then he left.

Lea called the sheriff. A responding deputy again told them that if they did not get a restraining order and a move-out order, they would go through this every day. Until they got the orders, there was nothing the deputies could do.

Later that morning, Pete and Lea agreed they had to get a restraining order and a move-out order. Lea had picked up the application form the week before. They filled it out, and Pete signed it. Defendant was outside at the time and across the street. Lea saw him walking away from the house and towards a baseball diamond near a school.

4

Pete asked Lea to take the application to the court. Lea drove her car to a friend's house, and her friend took her to the courthouse. Lea dropped off the form and was told someone from the court would contact her or Pete if the court issued the order.

Lea retrieved her car at her friend's house and reported to Pete what had happened. At Pete's encouragement, she went to her son's home to visit her grandchildren. Pete had said defendant was taking a nap and everything was fine. Lea tried calling Pete at around 2:00 p.m., but no one answered. She left her son's home around 4:30 p.m. to return to Pete's house. She saw sheriffs "flying by" her. As she approached the house, she saw "cops everywhere." She pulled her car over and stopped. A neighbor came out and said something about someone being in the street with a bat.

Lea drove her car up further and parked. She explained to an inquiring officer that she lived there, and she asked what was going on. The officer told her, and then she saw Pete wheeled out on a gurney. He was "all bloody." She saw defendant in a police car.

### 2. Defendant's 911 call

Defendant called 911 at 5:00 p.m., March 26, 2020. The prosecutor played a recording of the call to the jury, which went as follows:

"911: 911.

"FS: Hey, y'all, I don't know if he's dead or not but I'm sticking around. I'm sticking around. I lost it. You motherfuckers been coming here . . .

"911: What happened?

"FS: . . . for a long time.

"911: What happened?

"FS: I lost it. I lost it.

"911: What happened?

"FS: [Defendant stated an address.] I'm not running. I'm not leaving. [Address.] Send somebody fast.

5

"911:  Okay.  Okay.  What happened, sir?  Just stay on the line with me.

"FS:    I lost it.  I lost it.  I lost it.  I'm trying to ask him questions he's going what, what, what, what.  Then I'm fucking yelling at his ass, that's wh- what – what – what.  I lost it, Miss.  I fucking lost it.  I hit him with a bat.

"911:  Okay.

"FS:    I just hit him . . .

"911:  You hit him with a bat?

"FS:    . . . in the head.  I hit him with the bat, Miss.

"911:  Okay.

"FS:    I lost it.  These motherfuckers are fucking with me.  They – they keep pulling this shit.  I lost it.  I hit his ass with a bat.

"911:  Okay.  What's your name?

"FS:    My name is – you're talking Frank P. Swanson the IV.  I'm here.  I mean, I fucking lost it.

"911:  Okay.  All right.  Keep the line open.  I got help on the way, okay, sir?

"FS:    I lost it.

"911:  Do you still have the bat?

"FS:    No.  The bat's gone.  I threw it down.  I put it back.  I – I'm out in the street.  I lost it.  Uh . . .

"911:  Okay.  Who's injured?

"FS:    Uh, he supposed to be my grandpa, my father.  I don't know who the fuck he is.  I've got visions of death and shit.  I don't know what the fuck to do.

"911:  Okay.

"FS:    I don't know who the fuck (unintelligible) fucking – I don't know, man.

"911:  Okay.  Okay.

"FS:    I fucking lost it, man.  It's supposed to be family and instead he called me a cocksucker and fucking – holy fucking shit, man.  I fucking lost it.

6

"911:  Okay.

"FS:    Send 'em quick.  Send 'em quick.

"911:  They're coming.  They're coming.

"FS:    Send 'em quick.

"911:  Okay.  Okay.

"FS:    Um, they're right here.  Come on, come on, come on.  Over here, over here, over here, over here."

3.       Investigation

A sheriff's deputy entering the house saw Pete unconscious and leaned back in a chair facing a computer.  Pete had sustained extensive trauma to the right side of his head.  He was missing the upper part of his ear.  He was actively bleeding.  He was breathing, but it was very labored, and he was gurgling.  The deputy found a piece of Pete's ear cartilage on the ground near the computer desk.  Firefighters entered the house minutes later and began treating Pete.  He was transported by ambulance to the hospital, where he died.

Inside the house, sheriff's deputies found a black metal baseball bat in the living room behind the front door.  The bat had a red stain on its upper portion.  A large pool of blood was in front of the fireplace.  Blood splatter was on the computer desk, the desk chair, a paper shredder, the dining room chairs, the carpet, and the ceiling.  Pieces of body tissue were found on the dining room table and the dining room floor.  The tissue found on the floor was approximately 10 to 12 feet away from the computer hutch.

Deputies found a number of empty medication bottles in a trash can in the hallway bathroom.  Labels on the bottles were made out to defendant.  They stated the medications were Risperidone, Trazodone, Buspirone, Naproxen, and Levothyroxine.

A green Chrysler was parked in the house's driveway. Inside the vehicle, deputies found a wallet belonging to defendant. They also found what looked like coffee grounds on a plate in the front passenger seat.

The forensic pathologist who autopsied Pete's body determined that Pete died from blunt force trauma to the head. Pete suffered a tear over his right external ear, bruising on his eyelids, bruising and a laceration on the right side of his head, subcutaneous hemorrhaging above the right ear to the top of the head, a depressed skull fracture on the right temporal bone (temporal bone is the skull close to the right ear), linear skull fractures from the right temporal area up and over to the left side of the head, and subdural hemorrhaging. Pete also had bruises on his hands and wrists and his right elbow. The pathologist believed Pete could have been hit once or multiple times.

### 4. Defendant's statement to detectives

Sheriff's detectives Alexander Zakrzewski and Robert Peters interviewed defendant after his arrest. The interview was recorded, and the prosecutor played the video recording for the jury.

Defendant stated he moved into Pete's house after his father kicked him out. After the detectives read him his *Miranda*[1] rights, defendant said he was "tired of the games. [¶] . . . [¶] [T]hey pushed me to break him. I had to break him." Defendant said a woman in his head lied: "[S]he doesn't do nothin' but talk and shit. I'll talk to somebody, you know, and she'll, like, she's lookin' through my eyes. [¶] . . . [¶] She just talks and – talks and – talks. I tried – I tried committing suicide. I wanted to just have peace and quiet, like, sleep. I can't sleep. I can't enjoy TV. I went to Spaghetti Factory. I tried getting' 'em out of my head. It wouldn't help me." Asked if he took medication, defendant said no medication had worked, and he was tired of being a guinea pig.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

Defendant suffered his disorder all his life. He attended special education classes in elementary school because he was slower. His teachers verbally abused him because he could not stay focused. His father physically abused him while he was growing up.

Defendant stated he had been date-raped "all my life." He stayed quiet in high school because he did not want to be made fun of as being gay, so he let it happen and continued to let it happen. When he went to the hospital and told them he had been date raped, "straight to the nut house I went."

Defendant and his girlfriend had a child when they were 18 years old. They moved to Missouri to live with the girlfriend's parents, but the parents hired lawyers to have the child removed from them. The girlfriend went into the military and was stationed in Korea. Depressed, defendant attempted suicide, and the girlfriend arranged for him to receive treatment in South Carolina.

After spending time in jail, defendant attempted to participate in a treatment program. He asked Pete to take him to his doctor's appointments. Pete would agree, but on the day before the appointment, he would cancel and tell defendant he could not take him. Defendant missed his doctor's appointment.

Defendant said he had not slept during the night before the attack. "[I]t's hard to sleep with them goin' in my head all the time." He could not remember the last time he had deep rest where he awoke feeling rejuvenated. He had experienced this for 10 years.

Early in the morning on the day of the attack, defendant listened to music and went on social media. After listening to music, he paced a lot. He would pace in his room, the living room, and from the house's front door to the back gate and back again. He would sit in his green Chrysler, and then go back to pacing around his room. "I don't never get relaxation."

That morning, he was "goin' through it again and I back outside." The police came at around 4:00 or 5:00 a.m. and told him to go in his room and listen to some music. He did, and he also got on social media. After that, he went outside and walked to a

nearby park where he had attended parenting classes in the past. He returned home and spent more time on social media and sitting in his car. He "just felt weird."

Defendant said he was "goin' through it." Social Security had overpaid him while he was in jail recently, and they had deducted $60 from his usual $960 monthly payment. Pete and Lea had "been pickin' on me. They've been teamin' up on me." He helped around the house, "and they just team up on me after that – after all this help I do and then it's, 'You're a cocksucker,' and you got one sayin' this and then – then grandpa, like takin' her side because she's older than me and – and, like, you're takin' – you don't even know this lady and I'm your blood and you're – and you're sidin' with her. You're pickin' on me and I'm disabled and you're pickin' on a disabled . . . ."

Sometimes, defendant would sit in his car and smoke pot as a way to self-medicate. But not that morning. He had not had marijuana or alcohol for two or three days because he had no money. When he has no cigarettes or cigarette butts, he smokes coffee. Alcohol helps him sleep.

After sitting in his car, defendant went back inside. Pete was there. "And I talked to him. 'What?' I say it a little bit louder so maybe he could hear me. 'What?' I fuckin' yelled. 'What?' That's not right, man, not hearin' me. Why do I have to yell? I don't like yellin'." Defendant did not like fighting.

He continued, "I fuckin' got the bat, man. I did it. And they pushed me and they pushed me. They pushed me – they pushed me – they pushed me – they pushed me. My dad's girlfriend tells me, 'Go get a job.' Why do I gotta go get a job for, to take on more problems?"

The baseball bat was by the door. "[I]t's always there. They're callin' the police sayin' that they're scared, this and that, and – and that they're scared of me and that they had consideration and care for me and they're – and they're scared and I don't know if they wanna try and get a restrainin' order on me or somethin', throw me out, just like that one did." Defendant said his grandfather was so blind to the situation that he did not

10

notice defendant's lips were getting chapped and he was about to have cold sores due to his stress.

It was "either their way or the highway.  If they don't have control, then – then they don't – they don't wanna part of your life.  They don't wanna be a part of you.  If I ain't – if I ain't doin' this slavery, then they're gonna human traffic me."

The dialogue then proceeded as follows.  (AZ is the detective, and FS is defendant.)

"AZ:  Yeah, so did – so did you pick – pick the bat up or – or – or when - when did you pick the bat up?

"FS:  When I walked in and I was pacin' back and forth in the front room.  I was pacin' back and forth in the front room, I picked the bat up and I asked, er, no, I didn't pick the bat up.  I asked grandpa, 'Where's Lea?  How come she's not here takin' care of grandma?'

"AZ:  Mm-hm.

"FS:  'Is grandma callin' for her?'  I don't know.  But if she was, she couldn't – you couldn't hear her from the seat next to you – you couldn't hear her.  If she's in there screamin' and yellin', you wouldn't be able to hear her.

"AZ:  Mm-hm.

"FS:  So a while – while back, my grandfather said, 'I'm tired of takin' care of Belinda.'  Well, I heard it in my head.  I knew he said it out of his mouth and he meant it because the tone in his voice.

"AZ:  So le – so Lea wasn't -wasn't home?

"FS:  She wasn't home.

"AZ:  Okay.

"FS:  I grabbed the bat, thought nothin' of it, just moved and hit him.

"AZ:  How many times did you hit him?

"FS:  I think two or three.

"AZ:  Okay, where – where was he at?

"FS:  On a chair at the computer goin', 'What – what?'

"AZ:  Did he say anything else?

"FS:  Nope, just 'What?'  You ain't gotta yell.  I grabbed the bat.  I just wanted to hit him.

"AZ:  Was he facing you or . . .

"FS:  Well, he didn't turn towards me.  I think he had a peripheral vision of the bat and stuff and, uh, I didn't know – I don't get no compassion so that's what I showed him.  I showed him his own medicine.

[¶] · · · [¶]

"AZ:  So grandpa was sittin' [at the computer table] facin' towards the street.

"FS:  Yeah.

"AZ:  Was he – he was on – was he on the computer?

"FS:  Was he on the computer?  Yes.

"AZ:  Okay.

"FS:  But he wasn't lookin' at the computer, he was lookin' at me goin', 'What – what?'

"AZ:  Mm-hm.

"FS:  So I raised my voice.  When I raise my voice, I – what?  He could hear me.  He was just fuckin' with my head.

"AZ:  Right.  What did – what did you do with the bat afterwards?

"FS:  I hit him.  Y – he's lookin' at the damn – he's lookin' at the damn computer.  He could see me out his peripheral.  I hit him.

"AZ:  Okay.  And then where did you put the bat?

"FS:  Back where I got it – I think back where I got it behind the door.

"AZ:  All right.

12

"FS:    Either that or right there on the – on the couch.  I went – I went – I went outside 'cause I started – I started – after I flashed out, I came back and holy shit, I just fuckin' lost it – I just lost it.  I reached for my phone.  I'm – I'm tryin' to, uh, get the phone together and tryin' to get to where I could call 911 and finally I get the dial pad up and I dial 911.  And I do it – I just lost it – I just lost it and they got it all on recording and whatnot but – and then, uh, so I sat down in the middle of the intersection.  I just lost it.  I sat down right in the middle of the intersection.  I seen the police comin'.  I sat down.  They came out.  I don't know if they drew their gun or what.  They said, 'Put the phone down,' so I just put the phone down, put my hands behind my back, rolled over, got on my stomach, threw my hands.  I said, 'You get in there quick and get him.  I don't know if he's dead or not.' "

Defendant loved his grandfather.  He cherished his own flat thumbs because Pete had the same thumbs.  "But," defendant said, "I wish I don't have 'em because you treat me like shit.  I wish I don't have 'em because every time I look at 'em, I think of him.  And you know what, he never put a hand on me a day in my life.  He's never treated me like that a day in my life."

Defendant said he was ready for a "lethal injection."  "I'm tired of this world, man.  I don't wanna be here no more.  All this shit I go through for 35 fuckin' years, man.  What the fuck do I need to be here for?  Po- below poverty on the streets, fuckin', you're a druggie, you're this, you're that, blah – blah – blah, you got herpes.  What the fuck?"

B.    Defense

A forensic psychiatrist diagnosed defendant with schizoaffective disorder, bipolar type.  Schizoaffective disorder is a combination of schizophrenia and bipolar disorder.  Defendant also has severe alcohol and mild cannabis use disorders.

Defendant was experiencing delusions, a symptom of schizophrenia.  His beliefs that air bubbles moved food and medications into and out of his stomach, that he was

13

being poisoned, was involved in black magic, and that people were teleporting methamphetamine in and out of his stomach were delusions. He was hearing the voice of one of his children's mother and was seeing shadows at the corners of his vision. He also was suffering from mania.

The psychiatrist described the medications that had been prescribed for defendant, the bottles for which were found discarded. Risperidone is used to treat psychotic symptoms. Trazodone is an antidepressant medication that is also used as a sleep medication. Buspirone is used to treat anxiety. Levothyroxine is used to treat an inactive thyroid. And Naproxen is a pain reliever.

On cross-examination, the psychiatrist agreed with a statement he wrote in his report that the presence of psychotic symptoms at the time of the person's violent behavior did not automatically mean the person's psychosis was the cause of the violence. If a rational motivation existed for the violent behavior, the violence was not psychotic. It is possible a person experiencing active psychosis may act intentionally and understand the nature of his acts.

C.     Verdict and sentence

A jury found defendant guilty of second degree murder. (Pen. Code, § 187, subd. (a) [unless otherwise noted, subsequent statutory references are to the Penal Code].) The jury also found true that defendant used a deadly weapon to commit the crime. (§ 12022, subd. (b)(1).) The trial court sentenced defendant to a state prison term of 15 years to life plus one year for the weapon use enhancement.

# DISCUSSION

## I

### *Lack of Instruction on Voluntary Manslaughter*

A trial court is obligated to instruct the jury sua sponte on lesser included offenses if there is substantial evidence from which reasonable jurors could conclude the defendant committed the lesser offense but not the greater. (*People v. Souza* (2012) 54 Cal.4th 90, 115-116.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

Voluntary manslaughter is an unlawful killing that, among other circumstances, occurs "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Heat of passion is a mental state that negates the formation of malice. (*People v. Bryant* (2013) 56 Cal.4th 959, 968-969.) It is a state of mind "caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

The trial court did not instruct the jury on heat of passion voluntary manslaughter. It found without request, and defense counsel agreed, that there was no evidence of provocation. Defendant contends the court erred. He asserts there was sufficient evidence of provocation from which a jury could have found him guilty of heat of passion voluntary manslaughter and not murder, and thus the trial court was required to instruct on voluntary manslaughter.

We review a trial court's decision not to instruct on a lesser included offense de novo. We consider the evidence in the light most favorable to the defendant. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 501.)

Heat of passion voluntary manslaughter has an objective and a subjective component. (*Moye, supra*, 47 Cal.4th at p. 549.) To satisfy the objective component, the defendant's heat of passion must be due to " 'sufficient provocation.' " (*Ibid*.) The

15

provocation must be caused by the victim or be conduct reasonably believed by the defendant to have been the victim's conduct. (*Id.* at pp. 549-550.) The provocative conduct by the victim may be physical or verbal, but it must be so provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection under the given facts and circumstances. (*Id.* at p. 550; *People v. Cole* (2004) 33 Cal.4th 1158, 1215-1216 (*Cole*).)

Taunting words or simple assault, without more, are not legally sufficient provocation. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) " 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*Ibid.*) The provocation must be "one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection." (*Beltran, supra*, 56 Cal.4th at p. 949.)

To satisfy the subjective component of heat of passion voluntary manslaughter, the evidence must show that the defendant killed while under " 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550.) The passion aroused can be "anger, rage, or any violent, intense, highly wrought or enthusiastic emotion, except revenge." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481 (*Wright*).) The anger or passion must be so strong that the defendant's reaction "bypassed his thought process to such an extent that judgment could not and did not intervene." (*Beltran, supra*, 56 Cal.4th at p. 949.)

Thus, to justify an instruction on heat of passion, there must be substantial evidence in the record to support a finding that, "at the time of the killing, [(1)] defendant's reason was [] actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*Wright, supra*, 242 Cal.App.4th at p. 1481.)

Substantial evidence in the record satisfied at least two of the three requirements justifying an instruction on heat of passion voluntary manslaughter. The jury could have reasonably determined from the evidence that defendant's reasoning was obscured due to a strong passion, and that the passion was provoked by Pete's conduct. Defendant asked Pete where Lea was. Pete asked "what," and kept yelling "what, what" as defendant yelled at Pete. Angered by Pete's responses, defendant "lost it," in his words, and struck Pete with the bat.

At issue, then, is the third requirement to justify an instruction: whether substantial evidence existed from which the jury could find that the provocation was sufficient to cause a reasonable person to lose reason and judgment and to act rashly and from the heat of passion instead of from due deliberation.

Generally, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. (*Moye, supra*, 47 Cal.4th at p. 550; *People v. Wickersham* (1982) 32 Cal.3d 307, 327, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201.) However, for purposes of heat of passion voluntary manslaughter, the provocative conduct may comprise numerous incidents over a period of time, not just one incident at the time of the killing. (*People v. Wharton* (1991) 53 Cal.3d 522, 569; *Wright, supra*, 242 Cal.App.4th at p. 1481.) And, to justify an instruction on heat of passion voluntary manslaughter, the built-up provocation need not culminate in an instigative final act that caused a passionate or immediate reaction in the defendant resulting in the killing. (*Wright,* at p. 1488.)

Defendant contends that sufficient provocation occurred over a period of time and in an instigative final act immediately prior to the killing to justify an instruction on heat of passion voluntary manslaughter. In the weeks leading up to the killing, Pete and Lea criticized and tried to control defendant's behavior and Pete repeatedly told him to get out. On the day of the killing, Pete and defendant argued numerous times; Pete told him

17

to get out; and sheriff's deputies were summoned twice. Immediately prior to the killing, Pete yelled repeatedly when defendant asked him questions, and Pete called defendant a "cocksucker." Defendant argues that these various actions taken over a period of time and up to the killing constituted sufficient evidence of the type of provocation that would cause a reasonable person to act from the resulting passion rashly and without deliberation, and thus the trial court was obligated to instruct on heat of passion voluntary manslaughter.

A survey of a few reported opinions that apply this doctrine suggests that Pete's provocation of defendant over time and on the day of the killing was objectively insufficient to justify a voluntary manslaughter instruction. In *People v. Borchers* (1958) 50 Cal.2d 321 (*Borchers*), the California Supreme Court affirmed a trial court's reduction of a verdict from second degree murder to voluntary manslaughter where the evidence showed provocation over a period of time. The 29-year-old victim was the 45-year-old defendant's fiancé. (*Id*. at pp. 323-324.) The victim admitted ongoing infidelity with a "hoodlum" who defendant learned was a pimp. (*Id*. at pp. 324, 325.) Four days before the killing, the victim said she wished she was dead and attempted to jump from defendant's moving automobile. (*Ibid*.) On the night of the killing, she threatened to shoot the defendant, then urged him to shoot her, her son, and himself. He shot her after she called him a "chicken." (*Id*. at pp. 325-326.) The high court found that from this evidence, the trial court could have concluded the defendant was roused to "wild desperation" induced by the victim's conduct over a considerable period of time. (*Id*. at pp. 328-329.)

In *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*), abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 109-110, the California Supreme Court reversed a conviction for second degree murder based on evidence that the defendant was sufficiently provoked over a period of time as a matter of law. The defendant learned his wife was having an on-going affair with an acquaintance named

18

Bahr. (*Bridgehouse,* at pp. 407-408.) A few days after the defendant filed for divorce, the wife told the defendant she would fight the divorce action, she would lie to do so, and she would kill him if he tried to take away their children. (*Id*. at p. 408.) The next day, the defendant saw Bahr inside his mother-in-law's home sitting in the den, and he shot him multiple times. (*Id*. at p. 409.)

The high court found there was adequate provocation for heat of passion voluntary manslaughter. (*Bridgehouse, supra*, 47 Cal.2d at p. 414.) The defendant's wife was having an affair that had extended over a considerable period of time with the deceased, an acquaintance of the defendant's; she would not approve of the defendant's commencing an action for divorce nor forego seeing the victim; and the sight of the victim in his mother-in-law's home was a great shock to the defendant who had not expected to see him there or anywhere else. (*Id*. at p. 413.)

In *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), the California Supreme Court held that the trial court erred by not instructing on heat of passion voluntary manslaughter. The 46-year-old defendant married the 20-year-old victim, a woman from Israel. (*Id*. at p. 512.) Three days after the marriage, the victim traveled to Israel by herself. (*Ibid*.) When she returned six weeks later, she informed the defendant she had fallen in love with another man named Yako, they had been sexually intimate, and she wanted a divorce. (*Id*. at p. 513.) Over the next two weeks, the victim alternately taunted the defendant with her involvement with Yako, at one point saying she might be pregnant by him, and sexually aroused the defendant. (*Ibid*.) After arousing defendant but refusing to engage in sex, the defendant got out of bed to leave, but she screamed and yelled at him. He choked her into unconsciousness. (*Id*. at pp. 513-514.) Three days later, the defendant returned to speak with the victim. He waited 20 hours until she returned. (*Id*. at pp. 514, 516.) She said she supposed he had come to kill her. He vacillated but then said no. (*Id*. at p. 514.) She began screaming. They struggled, and the defendant strangled her with a telephone cord. (*Ibid*.)

19

The high court ruled that the evidence of provocation was sufficient to require an instruction on heat of passion voluntary manslaughter. (*Berry, supra*, 18 Cal.3d at pp. 515-516.) Relying on *Borchers*, the court determined that the evidence chronicled "a two-week period of provocatory conduct by his wife . . . that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Berry,* at p. 515.) The court rejected the Attorney General's argument that the killing could not have been done in the heat of passion because there had been a 20-hour cooling off period. The evidence showed the defendant had killed in a state of uncontrollable rage, and there was ample evidence in the record to support the conclusion that "this passion was the result of the long course of provocatory conduct by [the victim] . . . ." (*Id.* at p. 516.)

In *Wright, supra*, 242 Cal.App.4th 1461, the Court of Appeal held that the trial court erred by not instructing on heat of passion voluntary manslaughter based on the victim's provocation of the defendant over a period of time. The defendant and the victim shared a son. (*Id*. at p. 1474.) Their relationship soured. The victim, the son's father, believed the defendant, the son's mother, neglected the son, and he sought full custody. Their interactions were acrimonious, and the mother was harassing the father. (*Id*. at pp. 1472-1475.) A month or so after the father had again threatened custody modification, he brought the son back to the mother, and the boy was wearing only a diaper without the clothes she had put him in. (*Id*. at pp. 1476-1477.) The mother believed the father was hoarding the son's clothes to facilitate keeping the boy from her. (*Id*. at p. 1477.) She was despondent and suicidal. That night, she drove to the father's apartment complex and parked the car. She waited for the father to return from work and then shot him. (*Id*. at pp. 1477-1478.)

The Court of Appeal held that the evidence was sufficient to raise a factual question whether the mother was acting under the heat of passion provoked by the father's repeated threats to gain custody of their son when she shot him. (*Wright, supra*,

242 Cal.App.4th at p. 1486.)  Relying on *Borchers*, *Bridgehouse*, *Berry*, and other authorities, the court said there was evidence the mother killed after enduring provocation from the father in the form of his repeated threats to gain custody of their son, and there was evidence of her angry, confused response to those threats.  (*Id*. at pp. 1486-1488.)

By comparison, in *Cole, supra*, 33 Cal.4th 1158, the California Supreme Court affirmed the trial court's decision not to instruct the jury on heat of passion voluntary manslaughter as a lesser included offense of murder.  The defendant and the victim regularly drank, argued, and fought during their five-year relationship.  (*Id*. at pp. 1171, 1216-1217.)  The day before the killing, the victim informed an acquaintance that she was moving out without defendant, and that the defendant had seen a list of shelters for battered women the neighbor had given her.  (*Id*. at p. 1171.)  The following night, the defendant and the victim arrived home from the same bar at separate times.  (*Id*. at p. 1173.)  The defendant was intoxicated.  (*Ibid*.)  The victim had been asleep, but she awoke and threatened she would one day burn the defendant "to fuckin bits" and "cut your goddamn heart out."  (*Ibid*.)  She also told the defendant that if he lay down on the couch, she would "put a butcher knife in your ass."  (*Ibid*.)  Defendant went "berserk," poured gasoline on the bedroom floor, spilling some on the victim in the process, and ignited a fire with a cigarette lighter.  (*Ibid*.)  The victim later died from injuries caused by the fire.  (*Id*. at p. 1174.)

The high court determined there was insufficient evidence of the objective element of heat of passion voluntary manslaughter.  The victim was in bed when the defendant poured out the gasoline, and their conduct that evening, including the defendant's intoxication, was no different than the bickering, yelling, and cursing they engaged in over the course of their relationship.  (*Cole, supra*, 33 Cal.4th at p. 1216.)  The defendant relied on *Berry* to argue he was provoked over a period of time, but the court rejected the argument.  The parties' five-year relationship "was filled with excessive drinking and

21

fighting, sometimes violently, and their argument on the night of the fire was nothing out of the ordinary." (*Id*. at p. 1217, fn. omitted.)

Turning to the case before us, we conclude sufficient evidence did not support instructing the jury on heat of passion voluntary manslaughter. Pete's actions over the relevant course of time were not sufficient to provoke an ordinary person of average disposition in defendant's circumstances to lose reason or judgment and to act without reflection and solely from passion. While Pete's efforts to get defendant to be quiet and conform with house rules made defendant angry, they were not sufficiently provocative to cause an ordinary hearer to lose all judgment and react out of heat of passion.

Pete and defendant often argued about defendant's loud and belligerent behavior. Once, Pete asked defendant to move out to a boat in back to avoid disturbing Belinda if he was loud coming in and out. About a week before the murder, defendant told Lea he did not have to listen to her after she had asked him not to yell in front of Belinda. Pete said that defendant did not need to talk with Lea that way because she was there to take care of Belinda, and "you need to be nice. And if you can't, then just go." On another occasion, after defendant told Lea to shut her dog up or he would kill it, Pete told defendant to knock it off or get out. Pete's statements on these occasions angered defendant in part because he believed Pete was favoring Lea over his own grandson. But Pete's comments would not have provoked a reasonable person over time to lose all judgment and act rashly.

When defendant learned that some of his monthly Social Security payment would be withheld, Pete tried to calm him down by assuring him they would take care of it and the government would take only a portion of his monthly payment, not the entire payment as defendant feared. But defendant remained angry at the situation, and he expressed his anger to a Social Security employee. Pete did not provoke defendant in this instance.

22

In his interview with detectives, defendant claimed that Pete and Lea picked on him because of his disability and called him a "cocksucker" after he helped around the house. They pushed and pushed him, called the police on him, and it was either their way or the highway. Pete treated defendant "like shit."

No doubt emotions ran high starting the night before the killing. Pete's request that defendant come in and go to bed angered defendant. He said Pete could not tell him what to do, and he was not going in if he did not want to. Lea told Pete to let defendant stay outside. Pete kept "saying stuff," and Lea kept saying to let him be. Defendant told Pete to hit him if he wanted to. Pete said he did not want to hit him. He wanted defendant to "act like the good kid" he was.

During the night, Pete and defendant argued over defendant being loud. Pete told defendant to get out and leave if he did not want to comply with the rules. Defendant said he owned the house and Pete could leave. At 4:00 a.m., defendant was slamming doors and yelling at cars. Responding deputies told defendant to go in his room, lie down, turn on his stereo quietly, and go to sleep. Defendant went in his room, closed the door, and turned the stereo on "full blast." Pete went into defendant's room and told him to knock it off or he could leave. Defendant told Pete to get out of "his" house and leave him alone. He was doing what the deputies told him to do.

Pete came out to the living room and said he could not breathe, but he eventually fell asleep in a chair. But at 6:00 a.m., defendant resumed his behaviors. He screamed, yelled, slammed doors, and ran in and out. Pete got up and told him to knock it off and to leave if he could not be quiet. His grandmother was sleeping. Defendant said it was his house and he could do whatever he wanted. Then he left.

Later that morning and convinced by the deputies that they needed to get a restraining order, Pete and Lea completed the application while defendant was outside and walking away from the house. Later in the day, defendant came inside and asked Pete where Lea was. Pete, sitting at a computer desk, kept yelling "what, what" and

called defendant a cocksucker, and defendant kept yelling his question back. Then defendant "lost it" and struck Pete with the bat.

Pete's provocatory conduct objectively was not provocative enough to justify an instruction on heat of passion voluntary manslaughter. His conduct prior to the killing consisted of argument and statements to defendant in response to defendant's behavior that defendant be quiet, get out of the house, leave if he could not be quiet, and get out and leave if he did not want to comply with the rules. These arguments were not uncommon while defendant resided with Pete.

Pete did not threaten or taunt defendant. He gave defendant the choice whether to stay or leave. He did not inform defendant of taking any legal action. He did not act on defendant's taunt to hit him. Pete's behavior was not of the same type as repeatedly threatening a mother's custody of her child, taunting and criticizing a spouse while flaunting an affair with another person, or threatening to kill and then taunting to be killed, as addressed in the opinions discussed above. The circumstances here more closely resembled those in *Cole*, as arguing over defendant's behavior became a part of their relationship.

Significantly, defendant stated that Pete gave him no compassion, so that is what defendant showed him: "I showed him his own medicine." Defendant implied in this statement that he did not hit Pete rashly and without judgment. Rather, he hit Pete out of revenge, an emotion that by law cannot justify an instruction on heat of passion voluntary manslaughter. (*Wright, supra*, 242 Cal.App.4th at p. 1481.) Pete's conduct objectively was not sufficient to trigger in a reasonable person in defendant's circumstances the type of visceral shock, rage, or fear unbounded by judgment or thought on which heat of passion voluntary manslaughter is based.

Defendant argues there was sufficient evidence both of a course of provocative conduct and of an instigative final act to support instructing the jury on heat of passion voluntary manslaughter. The weakness in his course of conduct argument is that he

24

focusses almost exclusively on his subjective state of mind instead of how a reasonable person would react. He argues he was upset that Pete took Lea's side on some arguments. He felt they had teamed up against him and picked on him because of his disability. He believed that Pete and Lea were controlling. He claimed he could not " 'take shit no more.' "

His summary argument in his opening brief exposes its subjective point of view: "From appellant's perspective, he was made to *feel persona non grata* in what was now his home. He *felt* that he was treated as a nuisance because of his disability. He *felt* embattled at home because his grandpa and Lea had teamed up against him, would harass and insult him, would call him horrible names (like 'cocksucker'), would treat him like a child, would call the police on him, were constantly threatening to kick him out of the house, and were working together to get a court order to have him removed." (Italics added except for the Latin term.)

Defendant's perspective or how he "felt" are not relevant to determining whether Pete's course of conduct was so provocative as to cause an ordinary person of average disposition to lose reason or judgment and to react without reflection and solely from passion. Pete's name-calling and demands that defendant be quiet, go outside, and live by the rules or leave, in the circumstances in which he made those comments, would not cause an ordinary person to lose all reason and judgment and act rashly and solely from heat of passion.

Defendant asserts that three facts sparked immediate provocation and passion at the time of the killing: (1) he discovered that Pete and Lea obtained a restraining order behind his back; (2) Pete yelled when defendant questioned him; and (3) Pete called him a "cocksucker" again.

One of these factual assertions is not supported by the evidence. There is no evidence defendant learned that Pete and Lea had obtained or applied for a restraining order behind his back. Asked by the interviewing detectives whether the baseball bat was

always by the door, defendant stated, "[I]t's always there. They're callin' the police sayin' that they're scared, this and that, and – and that they're scared of me and that they had consideration and care for me and they're – and they're scared and *I don't know* if they wanna try and get a restrainin' order on me or somethin', throw me out, just like that one did." (Italics added.) This statement indicates defendant did not know whether Pete and Lea wanted to obtain a restraining order against him. He knew they were scared of him and had called the police, but his statement does not establish that he knew when he attacked Pete that they had already applied for or obtained a restraining order. We cannot infer he knew when he expressly said he did not know.

As for another factual assertion, the evidence that Pete yelled "cocksucker" while he was yelling "what" in response to defendant's questions comes from defendant's statement to the 911 operator when defendant said, "I fucking lost it, man. It's supposed to be family and instead he called me a cocksucker and fucking – holy shit, man. I fucking lost it." While it is not entirely clear by this statement that Pete called defendant the epithet while yelling "what," because we must view the evidence in defendant's favor, we will infer Pete called defendant the epithet while he was yelling "what" at defendant and that was when defendant "lost it."

Nonetheless, Pete's yelling "what" with each question and calling defendant a cocksucker was not so provocative as to cause an ordinary person of average disposition in those circumstances to be so inflamed as to lose all judgment and reason and act rashly without due deliberation or reflection. In *People v. Manriquez* (2005) 37 Cal.4th 547, the victim's calling the defendant a "mother fucker" and repeatedly taunting him to use a weapon if he had one was "plainly" insufficient provocation. (*Id*. at p. 586.) In *People v. Gutierrez, supra*, 45 Cal.4th 789, the defendant's telling the victim, the mother of his child, to " '[g]et off me, you f…ing bitch,' and that she 'cuss[ed] back at' him" was not sufficient provocation for voluntary manslaughter. (*Id*. at p. 827; see *People v. Najera*

26

(2006) 138 Cal.App.4th 212, 216, 226 [victim calling the defendant a "faggot" and a "fag" was insufficient provocation].)

Defendant relies on the prosecutor's closing argument and recitation of defendant's words to frame his own argument here. But the prosecutor's interpretation of the evidence and argument to the jury are not evidence. (*Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 796.) Moreover, the prosecutor was focusing on how the defendant subjectively acted and felt because he was arguing for the jury to find that defendant killed Pete with express malice and killed willfully, deliberately, and with premeditation. Thus, the prosecutor's argument to establish malice does not support defendant's argument that Pete's conduct objectively was sufficiently provocative to negate malice.

Because a reasonable person in defendant's circumstances would not have lost all judgment and acted rashly out of heat of passion due to Pete's provocations, substantial evidence did not support instructing the jury on heat of passion voluntary manslaughter, and the trial court did not err by not giving that instruction.

II

*Answers to Jury's Questions*

When a deliberating jury requests information on a point of law arising in the case, the trial court must provide the required information and help the jury understand the legal principles it is asked to apply. (§ 1138; *People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Section 1138 "imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.)

However, where the original instructions are full and complete in themselves, the court has discretion to determine what additional explanation is sufficient to satisfy the jury's request for information. (*People v. Beardslee, supra*, 53 Cal.3d at p. 97; *People v. Gonzalez, supra*, 51 Cal.3d at p. 1213.) "Indeed, comments diverging from the standard are often risky." (*Beardslee*, at p. 97.)

27

The trial court instructed the jury that defendant harbored implied malice if, among other factors, he deliberately acted "with conscious disregard for human life." (CALCRIM No. 520.)  The court also instructed the jury that when a person commits an unlawful killing but does not intend to kill and "does not act with conscious disregard for human life," the crime is involuntary manslaughter.  (CALCRIM No. 580.)

During deliberations, the jury sent the following questions to the court:  (1) "[w]hat is the legal definition of consciousness," (2) "[w]hat is the legal definition and/or the criteria for conscious disregard," and (3) "[i]n implied malice how is human life defined, is it life altering or life ending or combination."  After the court and counsel met and conferred in chambers, the court answered the questions by stating, "Refer to CalCrim Instruction 200."  CALCRIM No. 200 told the jury to follow the law as the court explained it.  It also informed the jury to follow the definitions of legal words or phrases provided by the court, and to apply words and phrases not specifically defined "using their ordinary, everyday meanings."

Defendant contends the questions indicated the jury was confused by the instructions given by the court, and the court's response was inadequate and nonresponsive.

A.    Forfeiture

The Attorney General contends defendant has forfeited this argument because his trial counsel did not object to the trial court's response.  Generally, if a party believes that a court's response to a jury request for information should be modified or clarified, that party must make a contemporaneous request to the court to that effect.  (*People v. Dykes* (2009) 46 Cal.4th 731, 802.)  The "failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal."  (*Ibid*.)

28

The record on this issue consists of the trial clerk's minute order. The order states only that the "[c]ourt and counsel met and conferred in chambers . . . ." It does not indicate whether defense counsel agreed with or objected to the trial court's response.

Nevertheless, by statute, a defendant may challenge an instruction on appeal that affects his or her substantial rights even if no objection was made in the trial court. (§ 1259.) Defendant contends that by not providing sufficient answers to the jury's questions, the trial court allowed the jury to apply an incorrect understanding of implied malice and convict him based on something less than conscious disregard of human life. Because such an error would affect defendant's substantial rights, we address his claims on the merits.

### B. Analysis

The trial court's original instructions were full and complete in themselves. At issue is whether the court abused its discretion by responding to the jury's questions as it did. (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1213.)

#### 1. Definition of "consciousness"

The jury asked for the legal definition of "consciousness." The parties agree the jury instructions did not use the word "consciousness," and defendant's consciousness was not at issue.

CALCRIM No. 580, the instruction on involuntary manslaughter, instructed the jury as follows: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is murder. An unlawful killing

29

resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter."

In closing argument, defense counsel used the term "consciousness requirement" to define CALCRIM No. 580's distinction between murder and involuntary manslaughter. Arguing that defendant's killing of Pete did not constitute murder, defense counsel stated, "Frankie didn't have the full knowledge, awareness, that's required for a murder. The consciousness requirement that differentiates between an involuntary manslaughter and a murder wasn't here in this case." Counsel said that CALCIM No. 580 "specifically talks about that consciousness requirement." "[Defendant] committed involuntary manslaughter. This was a disregard for human life, but it wasn't that consciousness requirement that is – that differentiates involuntary manslaughter from a murder. Because that's exactly what it does. It eliminates that conscious disregard requirement. It's just disregard or indifference to human life. That's involuntary manslaughter."

On rebuttal and addressing defendant's intent, the prosecutor argued, "There was no evidence that [defendant] didn't know what he was doing, that he wasn't conscious when he did it." After quoting defendant's statement to detectives that defendant thought nothing about picking up the bat after asking Pete where Lea was, the prosecutor stated, "Now, [defense counsel] wants you to hang your hat on that means he's not conscious? What did we hear about with premeditation, deliberation, and willfulness? A cold calculated decision can be reached quickly."

Defendant argues that defense counsel's use of the phrase "consciousness requirement" and the prosecutor's rebuttal may have misled the jurors. In ordinary, everyday language, "consciousness" means the state of being awake. Defendant asserts the jurors may have believed from counsel's argument and the prosecutor's rebuttal that "conscious disregard for human life" meant that defendant acted in a state of consciousness when he killed Pete. If so, they would think that the prosecution was

30

required to prove only that defendant was awake when he killed Pete in order to establish implied malice, not that he was aware of his actions. That is why they requested a definition of consciousness.

Defendant also contends the trial court's answer to the jury's question was not correct. By telling jurors with CALCRIM No. 200 to apply the ordinary, everyday meaning to undefined words, the court may have been interpreted as instructing the jurors to interpret consciousness as being awake, and the prosecution had to prove only that defendant was awake when he hit Pete in order to establish malice. Defendant asserts a proper answer would have informed the jury that no legal definition of consciousness would be provided because the term is not used in the instructions.

We conclude the trial court did not abuse its discretion in responding to this question as it did. CALCRIM No. 200 instructed the jury to follow the law and the definitions of legal words or phrases provided by the court, and to apply words and phrases not specifically defined "using their ordinary, everyday meanings." By following the law as instructed, the jurors would come to understand that the term "consciousness" was not used in the instructions, and they did not need to define it or apply it. To the extent they believed they had to understand that word due to defense counsel's argument, counsel made clear he was referring to the difference between murder and involuntary manslaughter. And by reading CALCRIM No. 580, the jurors would understand from the meaning of "conscious disregard of human life," as we discuss next, that counsel's use of "consciousness" referred to an awareness instead of just being awake, and that the term itself was irrelevant to their analysis. The trial court thus did not abuse its discretion in responding to the first question as it did.

### 2. Definition of "conscious disregard"

The jury asked to know the "legal definition and/or the criteria for conscious disregard." Defendant asserts that by reading the first and second questions together, it is

31

apparent the jurors were confused over the term "conscious," and they were debating whether a conscious disregard for life referred either to defendant's state of consciousness when he killed, i.e., was he awake, or his specific awareness of the risk that his conduct could result in Pete's death.

By following the trial court's response to follow the law as it was given them, the jurors would have understood that the meaning of "conscious disregard" involved being aware, and not just being awake. CALCRIM No. 520 explained malice aforethought to the jury, the state of mind required for murder. Defendant had express malice if he unlawfully intended to kill, and he had implied malice if, among other factors, he knew at the time he acted that his act was dangerous to human life, and he deliberately acted with conscious disregard for human life.

CALCRIM No. 580 explained that involuntary manslaughter was an unlawful killing committed without malice aforethought. It stated the defendant committed involuntary manslaughter if he did not intend to kill and did not act with conscious disregard for human life, i.e., did not act with implied malice.

CALCRIM No. 580 went on to explain that a conscious disregard for human life concerned awareness. The difference between murder and manslaughter was whether defendant was aware of the risk to life that his actions created and consciously disregarded that risk. If he wasn't aware, the killing was manslaughter. The instruction explained, "An unlawful killing caused by a willful act done with *full knowledge and awareness* that the person is endangering the life of another, and done in conscious disregard of that risk, is murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter." (Italics added.)

Because this instruction explained that conscious disregard concerned defendant's awareness of the risk to human life his actions endangered and his disregarding that risk, and not just whether defendant was awake, the trial court did not abuse its discretion by

32

directing the jury to follow the instructions to understand the meaning of conscious disregard.

### 3. Definition of human life

The jury asked, "[i]n implied malice how is human life defined, is it life altering or life ending or combination." Defendant claims this question shows the jury was confused over whether implied malice required a disregard of the risk of a life-altering consequence or the risk of death. But the trial court's direction in CALCRIM No. 200 to give undefined words their common meaning answered the jury's question. The phrase "human life" is a term in common usage. To endanger the life of another is commonly understood to mean to place a person at risk of death. The instructions reflected this understanding of the phrase. CALCRIM No. 580 states that "[a]n unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is murder." To endanger life means to put a person's life at risk of ending.

Moreover, in this matter, any perceived distinction between human life meaning risk of a life-altering or life-ending injury is irrelevant because defendant's actions ended Pete's life. The relevant inquiry was whether defendant consciously disregarded the risk that hitting Pete in the head with a baseball bat two or three times might kill him. The trial court did not err in its response to the jury's question regarding human life.

### III

### *Ineffective Assistance of Counsel*

Defendant contends his trial counsel rendered ineffective assistance when he did not object to the prosecutor's misstatement of involuntary manslaughter law during closing argument. In *People v. Brothers* (2015) 236 Cal.App.4th 24, the Court of Appeal held that an instruction on involuntary manslaughter as a lesser included offense "must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was

accomplished with implied malice during the course of an *inherently* dangerous assaultive felony." (*Id*. at p. 34, italics added.) The trial court instructed the jury that defendant committed involuntary manslaughter if he committed the crime of assault with a deadly weapon with criminal negligence (i.e., without implied malice) and his crime caused Pete's death. (CALCRIM No. 580.) The trial court also instructed on the elements of assault with a deadly weapon under section 245, subdivision (a)(1). (CALCRIM No. 875.)

In his closing argument, however, the prosecutor argued that involuntary manslaughter occurred only when the death resulted from a misdemeanor, a *noninherently* dangerous felony, or a lawful act committed with criminal negligence. He asserted that hitting someone on the head with a bat was not a misdemeanor, a noninherently dangerous felony, or a lawful act, and thus there was no evidence to support an involuntary manslaughter conviction as a lesser included offense. He also told the jury that CALCRIM No. 875 regarding assault with a deadly weapon did not apply because defendant was not charged with that crime. The prosecutor stated, "[F]or you to find that instruction to apply, you need to find this [i]s a misdemeanor act. Does that look like the aftermath of a misdemeanor?" Defense counsel did not object to the prosecutor's argument.

Defendant contends his trial counsel rendered ineffective assistance by not objecting to the prosecutor's argument. Defendant argues the prosecutor's misstatement of the law constituted misconduct. There was no conceivable tactical basis for counsel not to object, as counsel's theory was to confess his client's guilt of involuntary manslaughter as an alternative to murder. Defendant further argues that because the prosecutor's description of involuntary manslaughter did not directly contradict CALCRIM No. 580, the jury would not have recognized the conflict between the argument and the law and likely would have followed the invalid argument, and defense

counsel would not have been able to counter the argument by relying on CALCRIM No. 580.

To establish a claim of ineffective assistance of counsel, defendant must show, " 'first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.) A reasonable probability "is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

We are not required to address both elements of an ineffective assistance claim if the defendant makes an insufficient showing on one of them. (*Strickland v. Washington, supra*, 466 U.S. at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid*.)

That is the course we follow here. Based on reviewing the evidentiary record, we conclude that even if defense counsel had timely objected to the prosecutor's argument, it is not reasonably probable that the verdict would have been different. Counsel's arguments conflicted with the trial court's instructions. We presume the jury followed the

35

trial court's instructions and not counsel's argument. (*People v. Centeno* (2014) 60 Cal.4th 659, 676; *People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 14.)

The primary issue before the jury was whether defendant acted with malice. The court could not accept an involuntary manslaughter verdict until the jurors unanimously found that defendant was not guilty of murder, i.e., did not act with malice. (CALCRIM No. 640.) Defendant asserts the prosecutor's argument persuaded the jury to find malice because Pete was killed as a result of an inherently dangerous felony, which the prosecutor argued precluded the jury from finding a lack of malice. Defendant further argues that the prosecutor's argument was prejudicial to the second degree murder verdict because it told the jury that the law imputes malice when a victim is killed by assault with a deadly weapon.

We disagree with defendant's assertions. He incorrectly assumes that the jury followed the prosecutor's argument instead of the court's instructions. The trial court directed the jury to follow its instructions over any conflicting argument presented by the attorneys. (CALCRIM No. 200.) Thus, if the jurors harbored reasonable doubt over whether defendant acted with malice, they would have followed the court's instruction on involuntary manslaughter, CALCRIM No. 580. That instruction told the jury to find defendant guilty of involuntary manslaughter if defendant committed the crime of assault with a deadly weapon *with criminal negligence*, counsel's argument notwithstanding. (CALCRIM No. 580.) To find malice simply because defendant committed assault with a deadly weapon, as the prosecutor implied, would be contrary to the court's instruction to the opposite effect.

Moreover, defense counsel in his closing argument redirected the jurors to CALCRIM No. 580. CALCRIM No. 580 stated that if defendant committed the crime of assault with a deadly weapon with criminal negligence, and that crime cause Pete's death, he was guilty of involuntary manslaughter. Counsel emphasized, "If anything we say

36

conflicts with that instruction, you go back to that instruction as it was given to you by Judge Sweet."

" 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' " (*People v. Centeno, supra*, 60 Cal.4th at p. 676.)  There is no basis for us to find that the jury disregarded the court's instructions in favor of the prosecutor's contrary argument.

Moreover, contrary to defendant's argument, the prosecutor's argument did not reduce the People's burden of proof as can happen when a jury is not instructed on a lesser included offense and faces an " 'unwarranted all-or-nothing choice.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 365.)  The court instructed the jury on first and second degree murder and involuntary manslaughter.  Thus, the prosecutor's argument notwithstanding, because the jurors would follow the instructions, there was no risk they would convict defendant of murder so as not to have to acquit if the evidence established only involuntary manslaughter.

Finally, this was not a close case.  Although defendant suffered from mental illness, the evidence overwhelmingly established that defendant assaulted Pete with a dangerous weapon with malice.  Intentionally swinging a metal bat at the victim's head and hitting his head two or three times with enough force to sever the ear and pieces of body tissue and expelled them some 10 to 12 feet away from the victim and kill the victim were acts that were more than criminally negligent.  Thus, even if counsel had objected to the prosecutor's argument and the trial court admonished the jury, it is not reasonably probable the verdict would have been different.

DISPOSITION

The judgment is affirmed.

                                                   _____

                                                   HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

WISEMAN, J.*

_____

*  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.